R. A. BEAVER et al., Appellants,

v.

UNITED STATES of America, Appellee.

No. 19312.

United States Court of Appeals Ninth Circuit.

Aug. 24, 1965.

5

C. Randall Bain, Brown, Vlassis & Bain, Phoenix, Ariz., for appellants.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, Richard N. Countiss, Attys., Dept. of Justice, Washington, D. C., Manuel L. Real, U. S. Atty., Los Angeles, Cal., for appellee.

Burton M. Apker, Evans, Kitchel & Jenckes, Geo. Read Carlock, Ryley, Carlock & Ralston, Phoenix, Ariz., James F. Healey, Jr., F. W. Audrain, Bruce M. Jones, Los Angeles, Cal., Harold Pilskaln,

Jr., Santa Ana, Cal., for amici curiae (various title insurance companies).

Before BARNES, JERTBERG and MERRILL, Circuit Judges.

BARNES, Circuit Judge:

We extract from appellee's brief what we deem to be a fair statement of the facts and the parties' respective contentions:

"On October 10, 1960, the United States filed this condemnation proceeding to take 11.8 acres of land in Imperial County, California, for use in the Colorado River Front Work and Levee System Project. The United States was of the opinion that it already owned the 11.8 acres (hereafter, the tract) but because appellants claimed an adverse interest this action was instituted to condemn that interest, if any, and to determine any compensation to be paid appellants. The court held two non-jury trials, the first to determine the validity of appellants' contention that the court lacked jurisdiction because the tract was located in Arizona and, the court having found that the tract was in California, the second to determine the validity of appellants' claim of title and right to compensation. The court ruled that the United States had at all times possessed full fee simple title to the tract and that appellants had no claim of title or [right] to compensation. After final judgment in favor of the United States, this timely appeal was taken.

"A brief statement of the physical situation will aid in understanding the various contentions. The Colorado River (hereafter, the river), the boundary between Arizona and California, runs generally east to west along the southern boundary of the tract in question; the tract thus is presumably located on the California side of the River. We say presumably because decision of the jurisdictional question—whether the land is in California or Arizona—likewise decides the basic title question. The tract is bordered on the California side by a section of land officially described as Section 4, Township 9 South, Range 22 East, San Bernardino Meridian, in what is now Imperial County, California. Section 4 has been owned by the United States since the Treaty of Guadalupe Hidalgo, 9 Stat. 922 (1848), and has been withdrawn from public entry since 1929. The tract in question is in the same physical location as land patented to appellants' predecessor in title in 1914, and, at that time, located in Arizona. Prior to 1902, the river in this area flowed in a channel located several thousand feet north of its present location and along the southern boundary of Section 4. Between 1902 and 1942 the river channel moved in a southerly direction until it established the channel approximately in its present location.

"It is the contention of the United States that the river channel arrived at its present location by a slow accretive movement, eroding the southern (Arizona) bank of the channel and depositing soil on the northern (California) bank. In this manner the land claimed by appellants was washed away and the tract in question was added by accretion to Section 4, owned by the United States; under well-settled principles the tract thus belongs to the United States. Appellants, on the other hand, contend that the river arrived in its present location by several avulsive movements and for this reason the state boundary and the property line boundaries in the area were permanently fixed at the site of the 1902–1912 channel. Therefore, appellants say, the tract is still located in Arizona and appellants' land was not lost by erosion." (Appellee's Br. pp. 3–5. Transcript references omitted.)

In summary, the district court held that the property in dispute had been created on the California side of the river

by the gradual process of erosion and accretion. (R. 275–81.) On the basis of this finding, the court concluded that jurisdiction properly lay in the United States District Court for the Southern District of California. The court rejected appellants' theory that Arizona had annexed the tract by prescription (R. 281–83).

At a subsequent trial of the remaining issues, the district court found the land in question had accreted to government-owned land in California, and its title had thus been acquired by the United States Government. The court also rejected appellants' arguments (1) that they hold a vested interest under the Color of Title Act, 43 U.S.C. § 1068 (R. 404–05); (2) that the doctrine of re-emergence should be applied (R. 405); (3) that the United States cannot claim the tract because it induced the accretion process; and (4) that the United States is estopped from asserting title to land which appellants had improved. Final judgment was entered denying compensation to appellants and this appeal followed. We are asked to reconsider these four theories of recovery which the district court rejected.

### Estoppel.

From 1914, when the United States first issued its patent to the land, until 1940, this land was ostensibly privately owned, taxable land. In 1940, as a result of unpaid taxes, the land was "taken" by taxing authorities of the State of Arizona, and the County of Yuma. The land was subsequently sold to a private party in 1942 and was maintained in private hands until late 1960.

The Colorado River which abutted this land altered its course during the relevant years and "shifted" the disputed parcel, not as one would expect, from east to west, but from south to north, i. e., the river's new channel shifted from north of the subject parcel to the south. Precisely when this "shift" took place is one of the matters in dispute.

Appellants complain that eyewitness testimony to the character of the river's change was almost nonexistent, and, as a result, the parties and the trier of fact below were required to rely on old maps, aerial photographs and "theoretical reconstructions by hydrologists or engineers." Such a complaint, of course, is only incidentally relevant to appellants' claim of estoppel; once there exists substantial and valid evidence to enable the trier of fact to conclude that an accretion has taken place the issue cannot here be raised, unless that conclusion is clearly erroneous. For example, Exhibit 10 depicts the river as south of the subject land as of 1930. That evidence alone, we assume, would be sufficient upon which to base a finding of fact.

Were this a dispute between two private individuals, the doctrine of equitable estoppel would undoubtedly apply. But it is not such a dispute. Does the same doctrine apply to the government when it becomes a plaintiff in a condemnation proceeding? The government, of course, says it does not; the plaintiffs urge that it does.

Appellants rely primarily upon United States v. Certain Parcels of Land, 131 F.Supp. 65 (S.D.Cal.1955); State of Iowa v. Carr, 191 F. 257 (8th Cir. 1911); State of Michigan v. Jackson L. & S. R. R., 69 F. 116 (6th Cir. 1895).

We assume for the purposes of this case that (1) ordinarily the doctrine of equitable estoppel does not apply against the United States, particularly in those cases where it has not consented to be sued; (2) the general rule can be and has been recognized to be inapplicable, particularly where the United States has consented to be sued, or has instituted the litigation.

With the assumptions of the law in mind, we next consider the government's position that here involved is accreted land, to which a special rule applies—i. e., that such land can be disposed of only by Congress under Art. IV,

Sec. 3, Cl. 2 of the Constitution.[1] And see Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 330, 335–336, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (electric energy) and State of Alabama v. State of Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954) (submerged lands).

We will consider later whether the land here involved is governed by the doctrine of accretion, avulsion, or re-emergence. We assume here it is accreted land. If accreted land, it is *not* the land originally patented by the United States in 1914. If it is not the original land but rather is accreted land (accreted to land to which the title rests in the United States), then it also is land owned by the United States, whose title can be divested only by Act of Congress.

" 'The power over the public land thus entrusted to Congress is without limitations. "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine." ' " State of Alabama v. State of Texas, supra at 273, 74 S.Ct. at 482, quoting from United States v. City and County of San Francisco, 310 U.S. 16, 29–30, 60 S.Ct. 749, 84 L.Ed. 1050 (1940).

 This title, says the government, cannot be lost—by mistake, Lee Wilson & Co. v. United States, 245 U.S. 24, 31, 38 S.Ct. 21, 62 L.Ed. 128 (1917) (dealing with meander lines) ; or by unauthorized actions, Utah Power & Light Co. v. United States, 243 U.S. 389, 408–409, 37 S.Ct. 387, 61 L.Ed. 791 (1917). "[T]he United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." Id. at 409, 37 S.Ct. at 391. Nor can title be lost by acquiescence of employees of the executive branch of the government. United States v. State of California, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947). As a general rule laches or neglect of duty on the part of officers of the government (such as an implied acquiescence to the improvement of lands) is no defense to a suit to enforce a public right or protect a public interest. Utah Power & Light Co. v. United States, supra, 243 U.S. at 409, 37 S.Ct. 387.

We think apt the Supreme Court's language in the Utah Power & Light Co. case, supra, where it stated (p. 409, 37 S.Ct. p. 391) :

"[I]f it be assumed that the [general] rule [that the government cannot be estopped] is subject to exceptions, we find nothing in the cases in hand which fairly can be said to take them out of it, as heretofore understood and applied in this court. A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it."

Appellants point out that their estoppel claim should not be controlled by the Utah Power & Light Co. case, supra, because there private companies were using public lands "without any color of title, or claim of right" except alleged unlawful and unauthorized assurances of federal agents. In that respect, Utah Power & Light Co. had considerably more to rely on, for purposes of an estoppel argument, than appellants herein. Here their actions were taken without any *affirmative* reassurances or representations by government agents.

The same argument (laches, estoppel, adverse possession, valuable improvements) here urged by appellants against the United States was urged by the State of California against the United States

---

1. "The Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."

in United States v. State of California, supra. It was ruled upon by Mr. Justice Black at pages 39–40 of 332 U.S., at pages 1668–1669 of 67 S.Ct. He concluded:

"The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act." 332 U.S. at 40, 67 S.Ct. at 1669.

■ We are satisfied the district court was correct in holding the doctrine of estoppel inappropriate when sought to be applied against the government under the facts of this case.

Nor are we impressed by the argument that the government should be estopped in order not to seriously jeopardize the stability of land titles. Title to riparian lands has been so jeopardized since our Constitution was adopted. If any change in riparian rights is to be instituted, it should be by act of Congress, representing the wish of the people, and not by the courts on behalf of individual litigants.

### Color of Title Act.

We turn to the Color of Title Act (43 U.S.C. §§ 1068 et seq.) which reads in material part:

"The Secretary of the Interior (a) shall, whenever it shall be shown to his satisfaction that *a tract of public land* has been held in good faith and in peaceful, adverse, possession by a claimant, his ancestors or grantors, under claim or color of title for more than twenty years, and that valuable improvements have been placed on such land or some part thereof has been reduced to cultivation, * * * issue a patent for not to exceed one hundred and sixty acres of such land upon the payment of not less than $1.25 per acre * * * And provided further, That no patent shall issue under the provisions of this chapter for any tract to which there is a conflicting claim adverse to that of the applicant, unless and until such claim shall have been finally adjudicated in favor of such applicant." (Emphasis added.)

The trial judge found that "there was no showing that during the period the State of Arizona claimed the property for taxes between 1940 and 1942 any of defendants' [appellants here] predecessors in interest or the State of Arizona were in possession of the parcel."

The present action commenced October 10, 1960, and hence appellants' adverse possession lacked one year and four months of the required twenty-year period (Tr. 401). Appellants urge that a forty-six year claim of record title constitutes the equivalent of twenty years of adverse possession—equated by appellants to "physical possession"—despite the tax-sale period.

■ Appellants' assertion, however, is no rebuttal to the trial judge's finding that the State of Arizona never took possession of the parcel during the period it claimed the property for taxes. Although a state or other governmental body may adversely possess real property (3 Am.Jr.2d § 139), and though a state's possession by operation of law may be tacked to other possessory periods for purposes of satisfying the statutory period (2 C.J.S. Adverse Possession §§ 129–130), the state's possession, to be adverse, must still constitute color of title, as that term is applied to the actions of any party; it must be actual, open and notorious to satisfy the Color of Title Act. While considerable doubt exists as to whether Arizona's claim of property for taxes is one that can be characterized as under "color of title," (2 C.J.S. Adverse Possession § 74) we need not determine that question here. In any event, even if the State's claim were considered as one under color of

title, there must nevertheless be a showing that the claimant was in actual, exclusive, continuous, open and notorious possession of the parcel.[2] The record before us clearly supports the trial judge's finding that Arizona's claim was *not* accompanied by *any* form of possession. The twenty-year period prescribed by the Color of Title Act was therefore not satisfied.

■ No cases are cited to support appellants' position. Moreover, the government supports its position not only on a failure to prove the necessary adverse possession, but on the further fact that (a) this was not land subject to public entry, for it was land accreted to withdrawn land; and (b) withdrawn land is not subject to the Color of Title Act because it is already appropriated for other purposes. Federal Power Comm'n v. State of Oregon, 349 U.S. 435, 446–448, 75 S.Ct. 832, 99 L.Ed. 1215 (1955); Anderson v. United States, 218 F.2d 780, 15 Alaska 377 (9th Cir. 1955); Jones v. United States, 195 F.2d 707, 709, 13 Alaska 629 (9th Cir. 1952); United States v. Hanson, 167 F. 881, 886 (9th Cir. 1909).

Appellants have, therefore, not demonstrated a valid title to the disputed land under the Color of Title Act.

*Accretion Versus Avulsion.*

■ We next examine the question of whether the land involved is accreted land. It was upon that assumption that the foregoing points have been decided.

The determination of whether land is accretive depends, by Supreme Court definition, upon whether the shift of the land in question, when it has taken place, has been "gradual and imperceptible"; or "sudden and perceptible". Philadel-

phia Co. v. Stimson, 223 U.S. 605, 624, 32 S.Ct. 340, 56 L.Ed. 570 (1912).

Here, the United States presented detailed testimony and well-documented exhibits on the course of the river in the vicinity of the tract in question from 1902 to 1942. That evidence showed a small bend developing a short distance above the government-owned Section 4 between 1902 and 1912. The bend migrated in the classic manner, eating away soil on the concave bank and depositing soil on the convex bank. In this manner, the bend moved downstream eroding the Arizona bank and building up the California bank. Between 1922 and 1925, the bend reached the site of the land in Arizona that is now claimed by appellants. By 1925, about half of the land had washed away and by 1926 the land had been entirely taken and the bend was continuing its downstream progression. The United States land opposite this area was slowly being built up by the soils washed downstream so that between 1930 and 1936 the accretion was complete and the tract in question here was formed. Since 1936 the river has remained in relatively the same location as it flows past the tract. The district court's findings of fact are not as detailed as the foregoing summary of the United States' evidence, but the court agreed with that evidence and accepted the United States' theory of the case.[3]

Appellants claimed there was an avulsive change. The government contended that if any avulsive change had occurred, it had taken place at another location on the river. The trial court held that the weight of the evidence supported the government's position. It expressly found accretion, not avulsion, at the site of the disputed property.[4]

2. Faulks v. Schrider, 72 App.D.C. 308, 114 F.2d 587 (1940); Richterberg v. Wittich Memorial Church, 222 F.Supp. 324 (W.D.Okla.1963), aff'd 334 F.2d 869 (10th Cir. 1964), cert. denied 379 U.S. 1000, 85 S.Ct. 719, 13 L.Ed.2d 702 (1965); Buckhannan v. Nash, 216 F.Supp. 843 (E.D.Ark.1963); Boyle v. D-X Sunray Oil Co., 191 F.Supp. 263 (N.D.Iowa

1961); Payne Land & Livestock Co. v. Archuleta, 180 F.Supp. 651 (D.N.M. 1960).

3. See Clk's Tr. 278–81.

4. "In my opinion, the evidence establishes that the parcel in question accreted to the land on the California side and that no

The erecting of artificial structures does not alter the application of the accretion doctrine (County of St. Clair v. Lovingston, 90 U.S. (23 Wall.) 46, 50–66, 23 L.Ed. 59 (1874), unless, perhaps, structures are erected for the specific purpose of causing the accretion. Appellants claimed the Laguna Dam downstream, built by the government, increased the silt and thus caused heavier cutting power in the river upstream. The government evidence disclosed that the Laguna Dam had little, if any, effect upstream. The court found the building of the dam was an insignificant factor in the subsequent accretion.[5] We find substantial evidence to support this conconclusion.

■ As an alternative theory of recovery, appellants raised a title claim under the doctrine of re-emergence. That doctrine rests upon "easy identification" of riparian land "lost" and "found" again by re-emergence from the stream bed. These elements are not here present.

We agree with the government:

"That doctrine has been applied by some state courts as an exception to the doctrine of accretion, but not in a factual situation such as is present in this case. In order for the doctrine to be applied in those states that recognize it, two things must occur: First, the water-course must move across and submerge riparian land so that land formerly non-riparian is made riparian; then the watercourse must return to or near its original bed so that the riparian land that had been submerged is uncovered, or re-emerges.

\* \* \* \* \* \*

"The United States' land to which the tract has accreted was riparian originally and one of the reasons for the doctrine of accretion is to allow that land to remain riparian. Phila-

delphia Co. v. Stimson, 223 U.S. 605, 624 [32 S.Ct. 340, 56 L.Ed. 570] (1912). Appellants here seek to apply the 're-emergence' doctrine to render nonriparian land that was originally riparian. This is directly contrary to the purposes of the exception.

\* \* \* \* \* \*

"Stone v. McFarlin, 249 F.2d 54, 55–57 (C.A.10, 1957), cert. den., 355 U.S. 955 [78 S.Ct. 540, 2 L.Ed.2d 531] \* \* \* Anderson-Tully Co. v. Tingle, 166 F.2d 224 (C.A.5, 1948), cert. den., 335 U.S. 816 [69 S.Ct. 36, 93 L.Ed. 371], where the court stated (pp. 228–229): 'Where a river is a boundary and there is no avulsion, a land-owner can never cross the river to claim an accretion on the other side.' " (Appellee's Brief, pp. 15–17.)

■ An examination of the record indicates that not one of the district court's findings is totally unsupported by the evidence. Where the evidence is contradictory, yet a finding is made by the trier of fact which is reasonably supported by substantial evidence and is not clearly erroneous, that finding must be upheld; we have no power to change it.

Appellants suggest in their reply brief that while the government's position has "superficial appeal," it is fallacious because of the premise that the land was owned by the United States "as if never sold away by patent or as if subsequently repurchased under deed." The answer is that the accreted land on the south bank never was sold away by patent, and never was repurchased. Appellants equate the precise land lost by erosion from the land on the Arizona side of the river with the precise land gained by accretion on the California side. There is no "physical identity" between the two areas of land, even though each is described as within

boundary change took place by prescription and acquiescence." (Clk's Tr. 278.)

5. "[T]he assumption would not support a finding that the aggradation attributed to the building of the Laguna Dam was more

than a minor factor in causing the erosion and accretion at the site of the parcel. There were many other natural factors which played a part in the erosion and accretion which took place." (R. T. 406.)

the same Section 4, of Township 9 South, Range 22 East, San Bernardino Meridian. Accreted land comes from anywhere in the river above the accretion, grain by grain, and so gradually that tracing its source is theoretically impossible. If directly traceable, it more usually is evident that what occurred was the result of an avulsion process. State of Iowa v. Carr, supra, is relied upon by appellants, and that is a case involving avulsion, not accretion. If here there had been a finding of avulsion, rather than accretion, the Carr case would have been applicable.

Amicus Curiae were permitted to file a brief on behalf of certain title companies. It emphasizes that a decision for the government is deleterious to land titles, and that if we were to interpret the Color of Title Act to cover not only patentable land, but also withdrawn land —not open to patent—then settlers could obtain a vested right in this land and title insurance and trust companies could safely (and profitably) write title insurance. That might well be a commendable result. If Congress intended that result, it could have said so. If the Color of Title Act needs enlargement in the public interest, such change should evolve from legislative enactment, not judicial legislation.

Finding no error, we affirm.