423 P.2d 352

STATE of Arizona, Appellant,

v.

GUNTHER & SHIRLEY COMPANY, a corporation, and Sun Valley Ranch Company, a corporation, Appellees.

No. 1 CA–CIV 198.

Court of Appeals of Arizona.

Feb. 1, 1967.

Rehearing Denied March 2, 1967.

Review Denied March 21, 1967.

Darrell F. Smith, Atty. Gen., by Andrew L. Bettwy, Special Asst. Atty., for appellant.

Brown, Vlassis & Bain, by C. Randall Bain and Jack E. Brown, Phoenix, for appellees.

CAMERON, Chief Judge.

This is an appeal from a judgment of the trial court sitting without a jury quieting title to certain land along the left bank of the Colorado River in southern Yuma County, Arizona. Findings of facts and conclusions of law were requested and from the findings and conclusions and the judgment the defendant, State of Arizona, appeals to this Court.

We are called upon to determine:

1. Whether the disputed land developed by the process of accretion.

2. Does Arizona follow the doctrine of accretion?

3. Did the court err in admitting plaintiffs' Exhibits 20 and 21, being the reports of the Colorado River Boundary Commission to the State of California (Exhibit 20), and to the State of Arizona (Exhibit 21), and Exhibit 22, which was the judgment of another case in the nearby Yuma area?

4. Was the United States government an indispensable party to this action?

As indicated by the testimony and exhibits, the following facts are pertinent to the determination of the matter. The Colorado River rises in the high country of Colorado and Wyoming. The drainage area at Yuma is some 250,000 square miles, and there is water flowing in the River throughout the year. As the source of the flow of the Colorado River is very largely melting snow from the high elevation of the Rocky Mountains, usually above 13,000 feet, most of the precipitation that falls on the watershed does not reach Yuma until the spring and summer of the year—usually May, June and July. The Colorado; rushing as it does down from the mountains, scours its river bed through the Grand Canyon of the Colorado, and is one of the major silt-carrying rivers of the world. The amount of silt carried by the River and the size or coarseness of the silt is determined primarily by the rate of flow—the faster the flow the more silt the River can carry.

Before the River reaches southern Yuma County it has leveled off and flows on a meandering course through a series of three major alluvial plains, the Parker, Palo Verde and Cibola Valleys, where the River also forms the boundary between the states of Arizona and California. Further south, the Colorado passes through the Yuma Narrows, a point at the City of Yuma formed by Prison Hill on the south or left bank of the Colorado, and Indian Hill on the north or right bank of the Colorado. From there the Colorado travels westward for some four miles, and then goes south forming the boundary of the State of Arizona and the Republic of Mexico. Still further south (now called the Rio Colorado) the river forms the boundary between Baja, California, and Sonora in the Republic of Mexico, until at last it flows into the Gulf of California, where, being slowed to a stop, it drops the remaining sediment on the delta of the Colorado which has formed over many centuries by this process.

In recent years, with the completion of various dams along the Colorado, the River is now completely controlled. In the section known as the Yuma Reach from the present Laguna Dam some twelve miles south to the California-Mexico-Arizona border the River flows at a very slow rate, and the drop is a foot to a foot and one-half per mile. That part of the Yuma Reach immediately above and to the west of the Yuma Narrows is known as the South Gila Valley which is also an alluvial plain, the soil being comprised mainly of loose, fine, sandy silt deposited by the River over the centuries and easily erodible. Before the River was controlled by the Dams, the Colorado normally flowed at the rate of 15,000 to 20,000 cubic feet per second past the Yuma Narrows, though at flood stage over 200,000 cubic feet per second has been recorded.

The Gila River, which rises in New Mexico, receives precipitation during the winter months from the same storm and rain conditions that the watershed of the Colorado receives in the higher elevations of the Rocky Mountains. Since the Gila watershed is lower in elevation and less snow falls, the water immediately runs off and the Gila River then has its peak, or at times flood stage, in January, February, and sometimes March of any year. The Gila watershed is some 58,000 square miles. At one time in 1916 the Gila River flowed at the rate of 199,000 cubic feet per second past the measuring station at Dome, Arizona (approximately twenty miles to the east of the Yuma Narrows) and into the Colorado River. The rate of fall of the Gila River through the Gila Valley just before it reaches the Colorado is at a faster rate than the Colorado (six feet per mile), and therefore the speed of the water flow and the amount and size of sedimentation carried by the Gila is greater than that carried by the Colorado at this point. Because of the limited watershed and fast runoff, the Gila is dry part of the year.

In 1894 the federal government deeded to the State of Arizona the land between the 1874 confluence of the Gila and Colorado

Rivers near the Yuma Narrows, to a point some three miles east of the Yuma Narrows. In 1874 the Gila joined the Colorado at the Yuma Narrows. In 1905 and 1906 plaintiffs' predecessors in interest, obtained title by United States patent to property which, by description, bordered the 1874 south or left bank of the Gila River directly across the Gila from the land granted to the defendant State of Arizona. See Map A.

MAP A

GILA RIVER AND LEFT BANK OF COLORADO RIVER IN 1874 IN VICINITY OF YUMA, ARIZONA AND MEANDER OF GILA AND COLORADO RIVERS FOR YEARS 1895 AND 1903

Since that time, the confluence of the Colorado and Gila Rivers has migrated eastward so that at the time of trial the Gila River entered the Colorado to the east of the property in question. At the time of trial the west edge of the property deeded to plaintiffs commenced some two and one-half miles east of the Yuma Narrows on

the left or south bank of the Colorado River. The property in dispute is situated between the deeded portion and the present south or left bank of the Colorado. See Map B.

MAP B

See Map B.

As indicated by the testimony, when the faster moving Gila enters the slower moving Colorado, the rate of flow of the water from the Gila is diminished and eddys sometimes develop causing the dropping of sedimentation which can and does cause a buildup on various portions of the River and the building of sandbars below the confluence of the two Rivers. This erosion and deposition along the river is a natural process, particularly in an alluvial plain such as the Yuma Reach and the Gila Valley. Also, the River, as it curves, erodes the bank on the outside of the curve by the faster flowing water, while the slower water on the inside of the curve deposits silt along the inside bank, and by a process known as accretion builds up and gradually adds to the land.

At the trial the court had the benefit of several engineers and hydrologists who, with impressive backgrounds and extensive knowledge of the Colorado, were able to give much of the history of the Colorado River along the Yuma Reach. The trial court also had the opportunity to hear Mr. Frank Fergeson, a long-time resident of the Gila Valley, and the court was also able to consider over 156 different exhibits and official reports consisting of maps, aerial photographs, field notes, and official reports in making the findings of fact and conclusions of law herein filed.

## DID THE PROPERTY IN QUESTION DEVELOP BY ACCRETION?

Appellant first contends that the addition to plaintiffs' land was not caused by accretion but by avulsion.

■ It is generally agreed that additions to land located along a river bank by an avulsive process do not operate to alter title to said land. Our Supreme Court has stated:

"Accretion is the gradual, imperceptible addition to land forming the banks of a stream by the deposit of waterborne solids or by the gradual recession of water which exposed previously submerged terrain. (citations omitted) Where, however, as in this case, the stream changes its course suddenly or in such a manner as not to destroy the identity of the land between the old and new channels, the change is termed an avulsion. (citations omitted)

"In boundary disputes between states, as in those between riparian owners, the rule is established that where a stream which forms a boundary line suddenly leaves its old bed and forms a new one, by the process of avulsion, there is no alteration of the boundary line." State v. Jacobs, 93 Ariz. 336, 339, 380 P.2d 998, 1000 (1963).

After plaintiffs' predecessor obtained title in 1905 and 1906, the Colorado began to form a large loop to the north and west of the property in question. The south or bottom part of this loop curved into the property in question, and after the mouth of the Gila had migrated to the east of plaintiffs' property, the south or left bank of the Colorado curved into the deeded property. By the 1920 flood, the south or left bank of the Colorado was to the south of the deeded portion of plaintiffs' property. At this time, the loop was closed off (by way of a new channel) and the River, leaving the loop as an ox-bow, flowed to the Yuma Narrows past what was left of plaintiffs' property.

The trial court in its findings of fact stated as follows:

"9. At the point of a confluence of the two Rivers two phenomena occur which decidedly affect the course of the Colorado from the point of confluence for a considerable distance downstream. The first of these is the tendency of the flow to thrust the Colorado toward the bank opposite the confluence and to cause erosion on that opposite bank. The quantity of such thrust and consequent erosion is dependent upon the volume and velocity of the two respective Rivers at the confluence, the greater volume and velocity of the Gila in proportion to the volume and velocity of the Colorado, the greater the thrust. The second phenomenum is the deposition of the Gila sediment resulting from the eddying effect achieved when the two Rivers run together, these eddys or swirls occurring immediately below the point of confluence along the downstream bank, in this case the left or south bank. Because the eddys result in significant decreases in velocity and because the sediment-carrying capacity of the River is a function of velocity, deposition of sediment results.

\*    \*    \*    \*    \*    \*

"11. The depositions occurring immediately below the point of confluence of the two Rivers would in normal course be worked downstream by the Colorado through a process of erosion and deposition. Such deposition downstream tended

to be against the left bank, in part be-
cause the original deposit was generally
in that area and in part because the nor-
mal eddying action occurring immediate-
ly downstream from such deposit also oc-
curred against the left bank.

\*　　\*　　\*　　\*　　\*　　\*

"13. Deposition along said left bank oc-
curred at some time or times prior to 1938
sufficient to expand the land mass so that
by 1938 the River itself adopted a con-
figuration quite similar to that which it
has maintained to date, with the left bank
traversing at a northwesterly angle the
northern portions of Sections 24 and 23.
Indeed, as appears from 1930 aerial pho-
tographs, additional land mass appeared
in the form of new, young land in the
process of formation from sand and allu-
vium deposits as early as 1930 in approxi-
mately the same formation as the addi-
tional land appeared as mature land in
1938.

\*　　\*　　\*　　\*　　\*　　\*

"14. Since 1938, only minor additions to
the left bank as it appeared in 1938 (the
deeded land with the additional deposits
forming the 1938 configuration as above-
described) have occurred, but some addi-
tional deposits to the land, extending it
northward several hundred feet—for ex-
ample, by about 950 feet at the north-
eastern corner—have been made. The
additional deposits since 1938 have not
been greater probably because of the
lessened flow of the Colorado since con-
struction of the Hoover Dam 1935."

█ We agree that evidence is ample to
support the trial court's finding in this re-
gard, and we do not feel that appellant has
shown that the addition to the property was
caused by an avulsion as is contended. In
fact, the testimony of Mr. Perley M. Lewis
called by the appellees is very persuasive in
this matter:

"Question (by Mr. Bain): Colonel Lewis,
directing your attention now to the
longer period of time extending from
1874 to the present, and with reference
to your own opinion in this matter, do

you have an opinion as to whether or
not there have been any sudden or
violent cutoffs or jumps or other
sudden channel changes of either the
Gila or Colorado River in the area of
land in question excepting the change
discussed by you on June 8th, 1920?

"Answer: Yes, I have.

"Question: And what is that opinion?

"Answer: In my considered professional
opinion, all the movements of the Colo-
rado during that period was over ex-
tended periods of time in the normal
manner of deposition and accretion.

"Question: With respect to the Gila
River, is your opinion any different?

"Answer: My opinion is the same with
respect to the Gila River as it is with
respect to the Colorado River."

The avulsive change that occurred in 1920
and created the cutoff did not appear to
change the location of the River with respect
to plaintiffs' land, although it may well have
reversed a process of erosion which was
slowly taking away plaintiffs' property.
After the avulsion the process was reversed
and by accretion plaintiffs got all of their
deeded property back as well as the addition-
al property, the subject of this suit.

## DOES THE DOCTRINE OF ACCRE-
## TION APPLY IN THE STATE
## OF ARIZONA?

█ It is next contended by the State of
Arizona that the doctrine of accretion does
not apply in the State of Arizona. It is
the contention of the appellant that this doc-
trine is inconsistent with Arizona law. Our
Constitution states:

"The common law doctrine of riparian
water rights shall not obtain or be of any
force or effect in this state." Arizona
Constitution, Art. 17, Sec. 1, 1 A.R.S.
See also Brasher v. Gibson, 101 Ariz. 326,
419 P.2d 505 (1966).

The word riparian is defined as follows:

"RIPARIAN: Belonging or relating to
the bank of a river; of or on the bank.
\* \* \*" Black's Law Dictionary, 4th
Ed.

While it is true, as appellant contends, that Arizona rejects the doctrine of riparian water rights, we do not believe the right of owners of land situated along or on (or riparian to) a river bank to the increase of such land when made by accretion is also rejected. We find nothing inconsistent with a law that rejects the riparian right to water in a stream and embraces the riparian right of the land owner to the increase in the land by accretion:

"Hence, the general rule rests upon the equitable idea that a riparian owner should have the opportunity to gain by accretion since he is subject to the hazard of loss by erosion." United States v. 11,993.32 Acres of Land, D.C., 116 F. Supp. 671, 678 (1953).

## THE ADMISSION OF EXHIBITS 20, 21 AND 22

■ Appellant claims in its brief that Exhibits Number 20 and 21 should not have been admitted. Exhibit 20 is the report of Charles T. Leeds dated 9/15/54, to the Chairman of the Colorado River Boundary Commission, State of California. Exhibit 21 is the report of Perley M. Lewis dated 9/14/54, to the Colorado River Boundary Commission, State of Arizona. The court in its ruling stated:

"* * *

"The Court: I will admit these documents subject to a motion to strike at the close of the case if it isn't shown that they are appropriate evidence. In other words, you are going to have to use maps in them and so forth, and I will permit them at this time subject to a motion to strike."

We have searched the record and the minute entries in the abstract of record, and we have been unable to find where the appellant preserved this objection by moving to strike the exhibits at the end of the trial. Therefore, the objection has been waived.

Appellant also complains of the admission into evidence of plaintiffs' Exhibit Number 22, being the record in a case entitled Ogram v. Gunther & Shirley, as well as other parties, including the State of Arizona. The following testimony took place, page 100 of the transcript:

"Mr. Bettwy: Your Honor, I also take 22 while we are at it. This relates to documents in a quiet title action in Yuma. Summons, affidavit of publication, answer, decree, and again, if I recall, my stipulation with Mr. Brown, I stipulated that they could be admitted for the purpose of evidencing that a trial took place, but not for the purpose of offering in evidence in this court the evidence upon which the court made its decision.

"Mr. Brown: Let me try, as I understand it, to state what our stipulation is. What I was asked to stipulate to, and which I do, and that is that the State does not concede or admit in this action the facts upon which the Ogram action was based, any of the underlying facts.

"Mr. Bettwy: That is true.

"Mr. Brown: Of course. I say it is a relevant document.

"Mr. Bettwy: With the understanding.

"Mr. Brown: Nonetheless, you are free to do what you can and to dispute anything respecting the underlying facts involved.

"Mr. Bettwy: No, Your Honor, this is not it, and I hate to take the court's time, but—

"The Court: Better straighten it out, so go ahead.

"Mr. Bettwy: The only purpose for which this exhibit can be introduced under the stipulation, is to evidence the fact that trial took place, but we are not admitting, under the stipulation, as to any of the facts upon which the decision in that court is based, and I am sure I made this clear to Mr. Brown.

"Mr. Brown: The last sentence is perfectly clear to me. You are not making any admission of the facts by admitting this document into evidence.

The first is not merely the facts that the trial took place, I suppose in the sense is so, that is what the documents show, but they are relevant and they are in there because they are relevant documents, but I don't. They are official documents. Perhaps we don't need any stipulation with respect to the matter. They are, in effect, an admission against interest by the State of Arizona.

"Mr. Bettwy: Your Honor, then I would like the record to show we object to the admission of plaintiffs' Exhibit 22 on the grounds that a judgment in a former trial has no merit in another trial for the purpose of establishing the facts upon which the court in the former trial made the decision.

"The Court: Admitted."

■ Although the objection at the trial below was not clearly stated, and the basis upon which the matter was admitted is not certain, we do not believe admitting Exhibit 22 as well as 20 & 21, to be reversible error. The court sitting without a jury is presumed to have ignored or disregarded all inadmissible evidence in reaching its decision if competent evidence is sufficient, as herein, to support the judgment. Norvelle v. Lucas, 3 Ariz.App. 464, 415 P.2d 478 (1966), State v. Garcia, 97 Ariz. 102, 397 P.2d 214 (1964).

## WAS THE UNITED STATES GOVERNMENT AN INDISPENSABLE PARTY TO THE ACTION?

■ Defendant-appellant next complains that the United States government was an indispensable party to this action. With this we do not agree. The parties, as in this case the State of Arizona and plaintiffs, can and may litigate rights to this property as between themselves without taking into consideration any rights of the United States government in and to any of the property in question. While the United States government may have been a proper party, it was not an indispensable party. Bolin v. Superior Court, 85 Ariz. 131, 333 P.2d 295 (1958).

For the above reasons, the decision of the trial court is hereby affirmed.

DONOFRIO and STEVENS, JJ., concur.