UNITED STATES of America,
Plaintiff-Appellee,

v.

Iva May HARVEY, a widow, et al.,
Defendants-Appellants.

No. 77–2279.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1980.

Decided Nov. 16, 1981.

Rehearing and Rehearing En Banc
Denied March 10, 1982.

Wallace L. Duncan, Duncan, Brown, Weinberg & Palmer, P.C., Washington, D.C., Floyd H. Shebley, West Linn, Or., for defendants-appellants.

Robert L. Klarquist, Washington, D.C., for plaintiff-appellee.

Before KENNEDY and TANG, Circuit Judges and LARSON *, District Judge.

TANG, Circuit Judge:

This is an appeal by 162 individuals from a judgment ejecting them from approximately 27 acres of real property, Harvey's Fishing Hole, and awarding the government rental value ·damages for use and occupancy of this property since 1960.[1] Three issues are before us: 1) whether state rather than federal law should have been applied in the jury instruction on the question of accretion; 2) whether substantial evidence supported the jury verdict that Harvey's Fishing Hole was formed by accretion rather than avulsion; 3) whether the United States was estopped from asserting its claim to Harvey's Fishing Hole. We affirm the judgment below on all three issues.

## I.

This is a dispute between the United States and appellants over title to 27 acres of real property located along the Colorado River in Imperial County, California. The controversy over Harvey's Fishing Hole stems from the southerly shift of the Colorado River channel. In 1914, the United States conveyed the parcel now known as Harvey's Fishing Hole by patent deed to Cherry Carlin. Title can be traced from Carlin to Kindred and Iva May Harvey. According to the 1914 deed, the land lay south of the Colorado River in Yuma, Arizona. Between 1914 and 1935, however, the Colorado River moved in a southerly direction, passing through Harvey's Fishing Hole until it established a channel in its present location. In other words, although the property now known as Harvey's Fishing Hole lay south of the Colorado River in 1914, by 1935 it was located north of the river. The Harveys purchased the land in question in 1952. Harvey's deed, like Carlin's, described the property as located in Yuma, Arizona. In 1952, however, the property in fact lay north of the river.

Between 1956 and 1958, the Harveys cleared the property in preparation for development, obtained a sub-division permit and sold lots to third parties. By the time of trial, approximately 80 of the 96 lots had been sold to the other appellants.

In 1960, the United States resurveyed the property. The land was in the same geographical and physical location as that described in the 1914 patent. In 1960, however, it was described as located in California rather than Arizona. In 1967, the government notified the occupants of Harvey's Fishing Hole that it claimed title to the land, and in 1972, filed a suit for ejectment and damages.

There were three major issues presented below. The first involves the propriety of the lower court's jury instructions. The government argued that the river moved by the process of erosion and accretion. It contended that, as the river migrated southward, it eroded the land on the southern bank (what is now Harvey's Fishing Hole), and deposited alluvion on the northern bank in the process. Although the jury verdict supported the government's position, appellants moved for judgment notwithstanding verdict and for a new trial claiming that the district court erred in defining accretion in its jury instruction. Appellants appeal the denial of these motions. The second issue centers on the jury verdict of accretion. Appellants argue that Harvey's Fishing Hole was not formed by accretion. They contend that the river moved southward by avulsion, a process through which the river violently or rapidly leaves its original channel. Were this the case, owners of the land originally situated south of the river, the appellants, would not have been divested of title. The third issue is whether the government was estopped from ejecting the appellants from Harvey's Fishing Hole. The jury returned a verdict in favor of the government.

---

* Honorable Earl R. Larson, United States District Judge for the District of Minnesota, sitting by designation.

1. Appellants do not contest the lower court's damages assessment. They argue, instead, that they were not liable.

## II.

As was then required by the Supreme Court's decision in *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973), the trial court fashioned its jury instruction on federal common law definitions of accretion and avulsion. Two days before the court had ruled on Harvey's motions for judgment notwithstanding verdict and for new trial, however, the Supreme Court in *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977), overturned *Bonelli* and held that, absent an independent basis for the invocation of federal common law, state law controlled riparian ownership questions. *Id.* at 376–78, 97 S.Ct. at 589–90. Appellants moved for reconsideration of judgment shortly after the court entered judgment, arguing that, under *Corvallis Sand*, California law should have controlled the formulation of the jury instruction. The trial court denied the requested relief and appellants have renewed this claim on appeal.

According to appellants, an instruction based on California law would have resulted in a jury verdict against the government because California law differs from federal common law on the question of accretion. California Civil Code § 1014 recognizes a boundary shift only if it is precipitated by "natural"[2] as opposed to artificial accretion. The instruction advanced by the trial court made no reference to the cause of the accretion because it was modeled upon federal law. Appellants claim that, because at least some of the accretion must be attributed to non-natural causes, an instruction fashioned under California's accretion definition was required.

Our review of the law, however, convinces us that the court should have applied Arizona rather than California law. Because Arizona law parallels the federal common law rule employed by the court below, we affirm the judgment.

In *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), the United States, as trustee for the Omaha Tribe, sued several individuals over land that had originally been on the Nebraska side of the Missouri River, as part of the Tribe's reservation. Because the river gradually shifted, this land eventually became situated in Iowa. In resolving a choice of law issue on the accretion question, the Court distinguished its earlier decision in *Corvallis Sand* and found that federal common law, not state law, controlled the determination of the applicable law:

> [T]he general rule recognized by *Corvallis* does not oust federal law in this case. Here we are not dealing with land titles merely derived from a federal grant, but with land with respect to which the United States has never yielded title or terminated its interest. . . .

> In these circumstances, where the Government has never parted with title and its interest in the property continues, the Indian right to the property depends on federal law . . . [T]his is not a case where the United States has patented or otherwise granted lands to private owners in a manner that terminates its interest and subjects the grantee's incidents of ownership to determination by the applicable state law.

*Wilson*, 442 U.S. at 670–71, 99 S.Ct. at 2539.

Although the Court found federal common law controlling, it refused to promulgate a general federal common law rule of accretion and avulsion. Instead, the Court held that it would borrow state law in fashioning the federal rule of decision. *Wilson*, 442 U.S. at 671–76, 99 S.Ct. at 2540–42. In *Wilson*, application of Nebraska law was mandated because an interstate compact between Nebraska and Iowa required each

---

**2.** Section 1014 provides:

> Where, *from natural causes*, land forms by imperceptible degrees on the bank of a river, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any right of way over the bank.

> Cal.Civ.Code § 1014 (West 1954) (emphasis added)

state to respect titles, mortgages, and other liens that originally arose under the laws of the ceding state. *Wilson,* 442 U.S. at 678, 99 S.Ct. at 2542. *See United States v. Southern Pacific Transportation,* 601 F.2d 1059, 1066 (9th Cir. 1979). Consequently, even though the disputed land was ultimately situated in Iowa, the Court held that Nebraska law applied.

■ Because Arizona and California have entered into a boundary pact covering the land in issue the principles established in *Wilson* are equally relevant here. Although the Arizona-California Boundary Pact dictates no choice as to what law shall govern disputes over land,[3] in ratifying the pact, each state adopted a "preservation of rights" provision that declared:

Nothing contained in the provisions of this act .. shall prejudice the titles, rights or claims of any person, public or private, natural or artificial, to any of the lands herein involved whether such titles, rights, or claims arise or exist upon the basis that the lands affected by the designation of boundary as set forth in the compact and in this act were previously a part of the State of Arizona and have now become a part of the State of California, or were previously a part of the State of California and have now become

a part of the State of Arizona or otherwise. . . .

1963 Ariz.Sess.Laws ch. 77, § 5, *reprinted in* annotation to Ariz.Rev.Stat.Ann. § 41–522 (West 1974); 1963 Cal.Stats. ch. 859, § 4, *reprinted in* annotation to Cal. Gov't Code § 175 (West 1980). This language has the same effect as the compact language reviewed in *Wilson.*[4] The acquiring state, here California, must respect title in any ceded land if that title was valid in the ceding state, here Arizona. Under the *Wilson* holding, therefore, the district court was obligated to apply Arizona law in formulating its jury instruction. Accordingly, we reject the appellant's contention that the district court should have modeled its instruction after California law. Although the lower court employed federal common law rather than the Arizona rule, we find no reversible error in its instruction that defined accretion as a "gradual and imperceptible" movement. An instruction modeled on Arizona law[5] would contain the same language.[6] *See State v. Jacobs,* 93 Ariz. 336, 338–40, 380 P.2d 998, 1000–01, *cert. denied* and *appeal dismissed, Jacobs v. Arizona,* 375 U.S. 46, 84 S.Ct. 158, 11 L.Ed.2d 108 (1963); *Lusting State v. Bonelli Cattle Co.,* 107 Ariz. 465, 469, 489 P.2d 699, 703, *supplemented,* 108 Ariz. 258, 495 P.2d 1312 (1972), *rev'd,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); *State v. Gunther &*

3. *See* Interstate Boundary Compact Defining The Boundary Between the States of Arizona and California, Pub.L. 89–531, 80 Stat. 340 (1966).

4. The Iowa-Nebraska compact provides:
Sec. 2. The State of Iowa hereby cedes to the State of Nebraska and relinquishes jurisdiction over all lands now in Iowa but lying westerly of said boundary line and contiguous to lands in Nebraska.
Sec. 3. Titles, mortgages, and other liens good in Nebraska shall be good in Iowa as to any lands Nebraska may cede to Iowa and any pending suits or actions concerning said lands may be prosecuted to final judgment in Nebraska and such judgments shall be accorded full force and effect in Iowa.
*See* Act of July 12, 1943, ch. 220, 57 Stat. 494.

5. Unlike Cal.Civ.Code § 1014, the Arizona common law definition does not expressly focus upon "natural" causation. *See generally, State v. Bonelli Cattle Co.,* 107 Ariz. 465, 467, 489

P.2d 699, 701, *supplemented* 108 Ariz. 258, 495 P.2d 1312 (1972), *cert. granted,* 410 U.S. 908, 93 S.Ct. 957, 35 L.Ed.2d 269, *rev'd on other grounds,* 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 *rehearing denied,* 434 U.S. 1090, 98 S.Ct. 1290, 55 L.Ed.2d 797 (1973); *State v. Jacobs,* 93 Ariz. 336, 338, 380 P.2d 998, 1000–1001, *cert. denied* and *appeal dismissed sub nom. Jacobs v. Arizona,* 375 U.S. 46, 84 S.Ct. 158, 11 L.Ed.2d 108 (1963); *State v. Gunther & Shirley Co.,* 5 Ariz.App. 77, 81, 423 P.2d 352, 356 (1967).

6. Even though the district court "did the right thing for the wrong reason", we must affirm its judgment. We must affirm if the result is correct. *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937); *United States v. Best,* 573 F.2d 1095, 1100–01 (9th Cir. 1978); *United States v. Stevens,* 548 F.2d 1360, 1363 n.9 (9th Cir.), *cert. denied,* 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977).

*Shirley Co.*, 5 Ariz.App. 77, 81, 423 P.2d 352, 356 (1967).[7]

### III.

■ Appellants also contend that the evidence of accretion was insufficient to support a jury verdict and that the district court erred in denying their motion for judgment notwithstanding the verdict. We disagree. Because substantial evidence supported the verdict of accretion, the lower court did not err in denying appellants' motion.

In considering the propriety of a district court's denial of a motion for judgment notwithstanding verdict, the standard is whether, when viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the non-moving party. *Chisholm Bros. Farm Equipment Co. v. International Harvestor Co.*, 498 F.2d 1137, 1140 (9th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974). Substantial evidence is more than a mere scintilla. *Chisholm*, 498 F.2d at 1140. It must be evidence that a reasonable mind could accept as adequate to support a conclusion. *California Computer Products v. International Business Machines*, 613 F.2d 727, 733–34 (9th Cir. 1979). This evidence, however, must be examined in a light most favorable to the prevailing party. *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290 (9th Cir. 1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Chisholm*, 498 F.2d at 1140. Neither the district court nor the court of appeals may weigh the evidence. *Chisholm*, 498 F.2d at 1140. Our task on appeal, therefore, is the same as it was for the district court. We must determine

whether the government introduced substantial evidence. *Kaplan*, 611 F.2d at 290.

In support of its argument that the river moved by accretion, the government presented expert testimony from an hydrologist who had designed the channel work for the Colorado River and from a geologist-hydrologist who specialized in the history of shifting streams. Their testimony included aerial photographs and a series of maps that demonstrate the gradual southerly movement of the river between 1879 and 1972. The hydrologist also testified to the hydrologic impossibility of a river lengthening its channel by an avulsive movement. According to the government, from this evidence the jury could reasonably conclude that, in meandering, the river moved gradually by erosion and accretion.

Appellants, on the other hand, argued that the maps were unreliable and that the photographs were misleading. To support their theory of avulsion, appellants called eye-witnesses who testified to the violent and rapid changes in the river's course during the 1920's. Appellants also pointed to the repeated flooding of the river before Hoover Dam was built in 1935, claiming that uncontrollable flooding is inconsistent with the gradual process of accretion. Finally, they relied on the testimony of expert witnesses who conducted geological surveys and found an abandoned channel that the witnesses claimed could not have existed if the river had moved slowly by accretion.

In short, the jury heard expert testimony in support of both accretion and avulsion theories. Evidence was presented on both sides and both sides were contradicted on cross-examination. Nevertheless, only sub-

7. Appellants contend that accretion under Arizona law is confined to "natural" accretion. *Bonelli*, however, only held that "[w]here a river shifts to a new location as a result of unnatural forces, *the state* does not lose title to the bed of the stream in the old location." *Bonelli*, 107 Ariz. at 469, 489 P.2d at 703 (emphasis added). *Bonelli* did not involve an upland *private* claimant. Moreover, even the federal common law, consistent with the majority common law rule, recognized the rule that an upland owner could not benefit from self-employed *intentional* accretions. *Bonelli*, 414 U.S. at 323, 94 S.Ct. at 524–25. *See Schafer v. Schnabel*, 494 P.2d 802, 807 (Alaska 1972); *Board of Trustees v. Medeira Beach Nom., Inc.*, 272 So.2d 209, 212 (Fla.App.1973); *Brundage v. Knox*, 279 Ill. 450, 452, 117 N.E. 123, 125 (1917); *State by McKay v. Sause*, 217 Or. 52, 55, 342 P.2d 803, 806 (1959). Consequently, appellants' contention that a new trial is necessary in order to present a fuller demonstration of artificial accretion is meritless. Under *Bonelli*, such evidence *was* relevant. Indeed, as appellants admit, they expended much energy at trial on the issue of artificial causation.

stantial evidence is required to uphold the jury's verdict. The evidence presented by the government meets that standard. We, therefore, affirm the trial court's denial of appellants' motion for judgment notwithstanding the verdict.

## IV.

At trial, appellants contended that the doctrine of equitable estoppel barred the government from asserting a claim to Harvey's Fishing Hole. During the proceedings below questions of law and fact were generated on this issue and the jury returned a verdict in favor of the United States. Appellants challenge the court's instructions and the jury's verdict.

We conclude that the trial court correctly instructed the jury on equitable estoppel and that substantial evidence supported the jury's verdict. We, therefore, affirm.

### A.

Two legal questions are raised concerning equitable estoppel. First, the government claims that because public lands are held in trust by the federal government for the people, see U.S.Const. Art. IV, § 3, appellants cannot assert the doctrine of equitable estoppel against the government's interest in Harvey's Fishing Hole.[8] We have observed on several occasions, however, that in a proper case equitable estoppel will lie against a government claim to title in real property. See United States v. Ruby, 588 F.2d 697, 703–05 (9th Cir. 1978), cert. de-

nied, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); Skokmish Indian Tribe v. General Services Administration, 587 F.2d 428, 433 (9th Cir. 1978); United States v. Wharton, 514 F.2d 406, 409–12 (9th Cir. 1975); United States v. Lazy FC Ranch, 481 F.2d 985, 989 (9th Cir. 1973).

▮ Nevertheless, because the United States is trustee of public lands for the benefit of the general public, we have required an additional balancing test not necessary when reviewing an ordinary equitable estoppel claim. A litigant seeking to preclude a government interest in land must prove more than the technical elements of equitable estoppel: The litigant must establish equities that, on balance, outweigh the "inherent equitable considerations which the government asserts as the constitutional trustee on behalf of all the people." Ruby, 588 F.2d at 705.[9]

▮ The second question concerns the elements of equitable estoppel. Appellants argue that affirmative misconduct is not a necessary element of equitable estoppel when asserted against the federal government and that the district court erred in requiring proof of such conduct. This contention is meritless, for we have long held that affirmative government misconduct must be proven against the government. See Oki v. INS, 598 F.2d 1160, 1162 (9th Cir. 1979); Lake Berryessa Tenants' Council v. United States, 588 F.2d 267, 270–71 (9th Cir. 1978); Ruby, 588 F.2d at 703–04;

8. Because the Constitution explicitly entrusts to Congress the "power to dispose of and make all Rules and Regulations respecting the Territory and other property belonging to the United States", U.S.Const. Art. IV, § 3, cl. 2, the principle of separation of powers is directly implicated when equitable estoppel is sought to be applied against a federal claim to title in land. Although Congress may delegate administrative responsibilities to executive agencies, United States v. Cassiagrol, 420 F.2d 868, 876–77 (4th Cir.), cert. denied, 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654 (1970), the property clause has been interpreted as exclusive and "without limitations". United States v. City & County of San Francisco, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940). Consequently, when Congress has not authorized a disposition of federal lands, the application of a

remedy such as equitable estoppel against a federal claim or defense tends to frustrate the intent of a specific constitutional provision.

9. The United States contends that appellants cannot rely on 28 U.S.C. § 2409a (1976) in asserting that the United States is estopped from claiming title to the disputed accretions. Because we held in Ruby that, under common law principles, offensive and defensive use of equitable estoppel against the United States in quiet title actions may be appropriate, we need not decide the statutory question. See Ruby, 588 F.2d at 700, 703 (in quiet title action by government, defendant's estoppel counterclaim could succeed if affirmative misconduct established).

*Wharton,* 514 F.2d at 409–11.[10] Thus, the district court correctly instructed the jury that it must return findings on five, rather than four, elements: (1) whether the party to be estopped knew the facts; (2) whether the party to be estopped intended or could justifiably be perceived as intending its conduct to induce reliance; (3) whether the party asserting the estoppel was ignorant of the facts; (4) whether the party asserting estoppel relied upon the government's conduct; and (5) whether the government engaged in affirmative misconduct.

### B.

■ The special interrogatories returned by the jury indicated that the appellants failed to prove: 1) ignorance of the facts; 2) reliance upon the government's conduct; and 3) government misconduct. Appellants dispute these findings.

Pointing to several instances of alleged government misconduct, appellants assert that the jury's finding that the government was not guilty of affirmative misconduct is not supported by substantial evidence. First, the appellants allege that Kindred and Donald Harvey were informed by Graham Hollister, Special Assistant to the Secretary of the Interior, at a meeting on May 8, 1961, that the government did not intend to condemn Harvey's Fishing Hole. This conduct, however, is inactionable. Whether or not the government planned to condemn Harvey's Fishing Hole is irrelevant because the issue was whether the government planned to assert title to the land. Condemnation and assertion of title are not the same. Moreover, Hollister did advise the people at the May 8, 1961 meeting that the government planned to claim title to all land along the Colorado River.

The second ground of alleged affirmative misconduct involved a meeting in January 1963 between the Harveys and Melvin Crosby, then Assistant Administrator of the Lower Colorado Land Use Office. The let-ter that provided notice of the meeting advised appellants that there was "a question as to the status of the area you occupy in the Sportsmen's Paradise [Harvey's Fishing Hole] area, and discussion of this area must be deferred until a later date." Nevertheless, the issue was raised and Crosby informed the Harveys that Harvey's Fishing Hole was being claimed as accreted land by the government. Donald Harvey testified, however, that Crosby was shown a copy of the Harvey title and that Crosby stated that the title was good. Appellants contend that Crosby's statement concerning the status of their title was inconsistent with the government's earlier claim to the accreted lands. The fact that the Harveys had good title, however, is irrelevant to the question whether the government was asserting title to the subject land. The relevant issue was whether accretion or avulsion occurred and which title, the Harveys' or the government's, applied to the land in question.

Appellants next contend that the Harveys attempted to enter the litigation instituted by the government against different parties in *Beaver v. United States,* 350 F.2d 4 (9th Cir. 1965), *cert. denied,* 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966), a case involving a government claim to nearby land. After trial but before decision, the Harveys answered the government's complaint in *Beaver,* alleging that the issues in *Beaver* were similar to the facts and issues affecting their interest in Harvey's Fishing Hole. The government responded by filing a motion to strike the answer, claiming that the Harveys' claim of interest "in and to the lands adjoining the [Beaver] property and premises condemned herein are totally irrelevant and immaterial to the issues of the instant action." In response to this motion and pursuant to a stipulation, the Harveys agreed to withdraw their answer without prejudice. Subsequently, the Harveys continued to sell lots, allegedly relying on the substance of the government's motion to strike.

---

**10.** The Supreme Court recently observed that it has never decided what type of conduct by a government official would estop the government, or "whether even 'affirmative miscon-duct' would estop the government." *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1470–71, 67 L.Ed.2d 685 (1981).

We do not find the government's conduct in the *Beaver* case pertinent to the appellants' claimed reliance in this case. The government's position that the Harvey's claims were irrelevant in *Beaver*, an entirely different cause of action, in no way suggests that it would relinquish its claim to Harvey's Fishing Hole. Even if appellants were proper parties in the *Beaver* litigation, they withdrew their answer without prejudice pursuant to a stipulation. Consequently, the government's conduct was insufficient to warrant estoppel, because it "did not cause [appellants] to take action or fail to take action that [appellants] could not correct at any time." *Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam).

Appellants also argue that Crosby visited Harvey's Fishing Hole on official business in 1967 and agreed with them that the property was not accreted land. Although the record indicates that Kindred Harvey did elicit this concession from Crosby, appellants also concede, and the record indicates, that official government notification of its claim to Harvey's Fishing Hole was received shortly thereafter. This notice renders spurious any contention that appellants relied on Crosby's opinion. Because appellants cannot establish the requisite reliance, we need not reach the question whether Crosby's statement of opinion could constitute affirmative misconduct.[11]

■ Appellants also claim that the government's failure to notify them of its claim to Harvey's Fishing Hole until 1967 establishes equitable estoppel. This assertion fails for two reasons. First, because appellants knew of the prospective government claim prior to 1967, they cannot establish reliance on the government's alleged failure to notify.[12] Second, the government's failure to notify, even if true, could not constitute *affirmative* misconduct because appellants have not alleged facts establishing an active or intentional concealment. Mere negligence will not suffice.[13] *See TRW, Inc. v. F.T.C.*, 647 F.2d 942, 950–51 (9th Cir. 1981); *Lavin v. Marsh*, 644 F.2d 1378, 1383 (9th Cir. 1981); *Simon v. Califano*, 593 F.2d 121, 123 (9th Cir. 1979); *Santiago v. I.N.S.*, 526 F.2d 488, 493 (9th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

Appellants have failed to prove the necessary elements of estoppel. Because there has been an inadequate showing of equitable estoppel, we need not consider the additional balancing test required when equitable estoppel is asserted against the government.

AFFIRMED.

11. *See Schweiker*, 450 U.S. at 788, 101 S.Ct. at 1471 (negligent misstatement will not support equitable estoppel against government); *Lavin v. Marsh*, 644 F.2d 1378, 1383 (9th Cir. 1981) (citing *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947)) (persons dealing with government must assume that government agents may exceed their authority and provide misinformation).

12. The Harveys' contention that they were ignorant of the government's claim is frivolous. In 1960, they were served with a complaint in the *Beaver* litigation and in 1963, they filed a belated answer in the same action. Furthermore, the Harveys concede that at a meeting on May 8, 1961, the Special Assistant to the Secretary of Interior had informed them that the government might claim land along the lower Colorado River.

Nor can those who purchased from the Harveys claim ignorance. On September 5, 1961, the federal survey of the disputed land was recorded in the public land office record and, on August 25, 1961, in the Federal Register. These purchasers had constructive notice of the government's claim. *See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 383–86, 68 S.Ct. 1, 2–4, 92 L.Ed. 10 (1947); *Lavin v. Marsh*, 644 F.2d 1378, 1383 (9th Cir. 1981); *United States v. Consolidated Mines & Smelting Co.*, 455 F.2d 432, 447 (9th Cir. 1971); *Gaylord v. CIR*, 153 F.2d 408, 416 (9th Cir. 1946).

13. Appellants contend that the jury's verdict is internally inconsistent because it found the absence of affirmative government misconduct, yet it also found that the federal officials intended to induce reliance. We disagree. An absence of affirmative misconduct and the presence of an intent to induce reliance are not inconsistent if the conduct intended to be relied upon were negligent misconduct.