ALABAMA *v.* TEXAS ET AL.

NO. —,

Argued February 3–4, 1954.—
Decided March 15, 1954.

*William E. Powers,* Attorney General of Rhode Island, *Si Garrett,* Attorney General of Alabama, *Benjamin V. Cohen* and *Marx Leva* argued the cause for complainants. On the briefs were *Mr. Powers, Mr. Cohen, Thomas G. Corcoran* and *Eugene Gressman* for the State of Rhode Island; and *Mr. Garrett,* and *M. Roland Nachman, Jr.* and *Gordon Madison,* Assistant Attorneys General, for the State of Alabama, complainants.

*Edmund G. Brown,* Attorney General of California, *John L. Madden,* Assistant Attorney General of Louisiana, *Jesse P. Luton, Jr.,* Special Assistant Attorney General of Texas, and *Oscar H. Davis* argued the cause for defendants. On the briefs were *Mr. Brown, William V. O'Connor,* Chief Deputy Attorney General, *Everett W. Mattoon,* Assistant Attorney General, and *George G. Grover,* Deputy Attorney General, for the State of California, and *Richard W. Ervin,* Attorney General, *Howard S. Bailey* and *Fred M. Burns,* Assistant Attorneys General, and *John D. Moriarty,* Special Assistant Attorney General, for the State of Florida; *Fred S. LeBlanc,* At-

torney General, *Mr. Madden* and *Bailey Walsh,* Special Assistant Attorney General, for the State of Louisiana; *John Ben Shepperd,* Attorney General, *Robert S. Trotti,* First Assistant Attorney General, *Mr. Luton,* and *William H. Holloway* and *Phillip Robinson,* Assistant Attorneys General, for the State of Texas; and *Attorney General Brownell, Acting Solicitor General Stern, Assistant Attorney General Rankin, Oscar H. Davis, John F. Davis* and *George S. Swarth* for Humphrey et al., defendants.

PER CURIAM.

The motions for leave to file these complaints are denied. Article IV, § 3, Cl. 2, United States Constitution. *United States* v. *Gratiot,* 14 Pet. 526, 537: The power of Congress to dispose of any kind of property belonging to the United States "is vested in Congress without limitation." *United States* v. *Midwest Oil Company,* 236 U. S. 459, 474: "For it must be borne in mind that Congress not only has a legislative power over the public domain, but it also exercises the powers of the proprietor therein. Congress 'may deal with such lands precisely as a private individual may deal with his farming property. It may sell or withhold them from sale.' *Camfield* v. *United States,* 167 U. S. 524; *Light* v. *United States,* 220 U. S. 536." *United States* v. *San Francisco,* 310 U. S. 16, 29–30: "Article 4, § 3, Cl. 2 of the Constitution provides that 'The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States.' The power over the public land thus entrusted to Congress is without limitations. 'And it is not for the courts to say how that trust shall be administered. That is for Congress to determine.' " *United States* v. *California,* 332 U. S. 19, 27: "We have said that the con-

stitutional power of Congress [under Article IV, § 3, Cl. 2] is without limitation. *United States* v. *San Francisco*, 310 U. S. 16, 29–30."

THE CHIEF JUSTICE took no part in the consideration or decision of these cases.

MR. JUSTICE REED, concurring.

The *per curiam* opinion in these cases bases its conclusion that the Submerged Lands Act of 1953, 67 Stat. 29, is constitutional on the language in Art. IV, § 3, of the Constitution: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; . . . ." I agree with that result. Neither Alabama nor Rhode Island has questioned or would question that power, if the applicability of that clause were accepted.

Those states, however, do not accept the applicability of the quoted clause. It is their position that the resources under the marginal sea do not, under *United States* v. *Texas*, 339 U. S. 707, *United States* v. *Louisiana*, 339 U. S. 699, and *United States* v. *California*, 332 U. S. 19, constitute property either of the United States or of any state. The complainant states assert those cases held that the "paramount rights" in the United States decreed by this Court arose from the sovereignty of the United States and the duty to provide for the common defense. Further, they urge that the rights are held in trust for all the states as a federal responsibility and to cede them to individual states would take away the "equal footing" among states by extending state power into the domain of national responsibility. See *United States* v. *Texas*, *supra*, at 719, and *Coyle* v. *Oklahoma*, 221 U. S. 559.

This Court is the only court for the trial and discussion of the points upon which Alabama and Rhode Island

rely. We have heard complainants on all these points and I desire to state why I think the arguments extracted by the states from this Court's ruling authorities on these same rights do not justify a hearing.

The fact that Alabama and the defendant states were admitted into the Union "upon the same footing with the original states, in all respects whatever," 2 Stat. 701, 3 Stat. 489, 5 Stat. 742, 797, 9 Stat. 452, does not affect Congress' power to dispose of federal property. The requirement of equal footing does not demand that courts wipe out diversities "in the economic aspects of the several States," but calls for "parity as respects political standing and sovereignty." *United States* v. *Texas, supra,* at 716. The power of Congress to cede property to one state without corresponding cession to all states has been consistently recognized. See, *e. g., United States* v. *Wyoming,* 335 U. S. 895, and cases cited by the Court.

While this Court did not hold in express terms in the *Texas, Louisiana* and *California* cases that the area in question belonged to the United States as proprietor, it did hold that "the Federal Government rather than the state has paramount rights in and power over that belt, an incident to which is full dominion over the resources of the soil under that water area, including oil." 332 U. S., at 38–39. This incident is a property right and Congress had unlimited power to dispose of it.

If the marginal lands were thus declared by the *California* and following cases to belong to the United States, they were ceded to the states through the subsequent Submerged Lands Act of 1953 by the clause: "[T]itle to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters . . . are hereby . . . recognized, confirmed, established, and vested in and assigned to the respective States . . . ."

§ 3 (a). If, on the other hand, the marginal lands were not declared by those cases to belong to the United States, title to them remained in the respective states. Either by original ownership or by the cession of the Act, the lands are now the property of the respective states. The use or control of the undersea area and its resources by the respective states cannot, therefore, now be challenged by any other state on the ground of lack of sovereignty in the challenged state.

The cession challenged here does not affect the power and responsibility of the United States as sovereign to foster and protect against foreign and domestic enemies that area or resources ceded to the proprietorship of the respective states. The Federal Government, of course, owes the same duty to the undersea area that it does to the uplands, the tidelands or the beds of the inland waters. Moreover, the Submerged Lands Act purports to convey to the states only "the lands beneath navigable waters" and "the natural resources within such lands and waters" and expressly provides that "[t]he United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others by section 3 of this Act." § 6 (a). Surely this provision negatives any contention that the Act empowers individual states to alter the historic relationship of the states respecting navigation of the ocean. See *Kelly* v. *Washington*, 302 U. S. 1; cf. *Toomer* v. *Witsell*, 334 U. S. 385.

The United States holds resources and territory in trust for its citizens in one sense, but not in the sense that a private trustee holds for a *cestui que trust*. The responsibility of Congress is to utilize the assets that come into its hands as sovereign in the way that it decides is best for the future of the Nation. That is what it has done here. Such congressional determination as the legislation here in question is not subject to judicial review.

MR. JUSTICE BLACK, dissenting.

Alabama and Rhode Island asked leave to file complaints to challenge an Act of Congress which purports to convey to some of the states an indefeasible title to and ownership of soil under the Gulf of Mexico and the Atlantic and Pacific Oceans. The Act includes a similar gift of all the "natural resources within such lands and waters." Some states are given a three-mile strip of ocean; some states are given about ten miles; most states are given no ocean at all. Some states that are thus receiving gifts claim even more. Louisiana by law makes claims extending 30 miles into the Gulf of Mexico. Texas, it is said, claims that at some points its state borders project as far as 150 miles into the Gulf. If Congress can cede three miles of ocean I see no reason why it could not later cede 150 miles or more.

Alabama and Rhode Island deny that Congress has any power to dispose of the national interest in the Ocean or its uncaptured resources. These States assert that whatever power the United States has over the Ocean is an inseparable part of national sovereignty which cannot be irrevocably parcelled out or delegated to states, individuals or private business groups. Admitting the power of Congress to control and regulate the use of the Ocean and the capturing of its assets, Alabama and Rhode Island deny that any part of this sovereign

national control can be vested in any state. Such an unauthorized abdication of essential national sovereignty, so the two States urge, is precisely the effect of the challenged Act. If true, this subjection of Alabama and Rhode Island to regulation by other states deprives them of that "equal footing" as States which is theirs by right. *United States* v. *Texas*, 339 U. S. 707, 719. The Court, however, summarily denies Alabama and Rhode Island a right even to file their complaint. This I assume must be done on the ground that the claims they present are so clearly without merit as to be frivolous. I am unable to agree to this and would grant leave to file in order that the case might be considered in the usual manner. My reasons can be briefly stated.

Ocean waters are the highways of the world. They are no less such because they happen to lap the shores of different nations that border them. Freedom of the seas everywhere is essential to trade, commerce, travel and communication among the nations. These far-flung international activities have frequently led to conflict and war. The War of 1812 bears witness to this. In ocean waters bordering our country, if nowhere else, day-to-day national power—complete, undivided, flexible, and immediately available—is an essential attribute of federal sovereignty. The present Act might be construed in such way that this power would not be substantially impaired, weakened or made less easily available at all times. But the Court is not construing it that way.

The Act's language purports to convey "all right, title, and interest of the United States" to immense ocean areas as though the Ocean could be divided up and sold like town lots. If valid, the Act grants to states all "proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources" of the Ocean. The result is that some favored states can say how, when, for what pur-

poses and to what extent other states and their citizens may use the Ocean or its resources. This raises serious and difficult questions with respect to the authority of Congress to relinquish elements of national sovereignty over the Ocean.

Once private property rights in ocean waters are recognized, I am uncertain where lines can be drawn. The Court's decision today in *Federal Power Commission* v. *Niagara Mohawk Power Corp., ante,* p. 239, goes a long way toward partitioning up the running rivers of America into conceptualistic segments.[1] Under that case the Government is likely to have to pay large sums if it wishes to use its rivers. MR. JUSTICE DOUGLAS' dissent in the *Niagara Mohawk* case should warn us to beware of extending the concept of state ownership of land under inland streams to the vast ocean areas of the world.[2] The results in that case are in my view bad enough. But it could be far worse to permit agencies other than the United States to clutter up the Ocean with multitudinous wells and derricks and deeds and leases and time-consuming lawsuits. All of these things suggest some of the dangers of depriving the United States of complete, unhampered control of the Ocean bordering our Nation. We should not forget that the Ocean "belongs to no one nation, but is the common property of all." *Lord* v. *Steamship Co.,* 102 U. S. 541, 544.[3]

---

[1] This Court has referred to ownership of submerged lands under navigable streams as "theoretical ownership and dominion," "a qualified title," and "a bare technical title." *Scranton* v. *Wheeler,* 179 U. S. 141, 160, 163. See also *United States* v. *Commodore Park, Inc.,* 324 U. S. 386, 390.

[2] See *United States* v. *California,* 332 U. S. 19, 36.

[3] It is true that the Act does purport to reserve for the United States "all its navigational servitude and rights in and powers of regulation and control . . . for the constitutional purposes of commerce, navigation, national defense, and international affairs . . . ." But surely this reserves nothing that Congress could give away. Any

The Constitution does give Congress power to dispose of and regulate "Territory or other Property belonging to the United States." This power, where it applies, has been declared to be unlimited. Congress, the Court has said, "may deal with such lands precisely as a private individual may deal with his farming property." *Camfield* v. *United States,* 167 U. S. 518, 524. Of course, this authorizes Congress at will to sell or dispose of property it owns as property. It could produce oil from the Ocean and sell that property. It could have that oil produced by its agents. But I have difficulty in believing that any state can be granted power under our Constitution to exact tribute from any other state that wants to take oil or fish from the Ocean which is the common "property" of all. And I have trouble also in thinking Congress could sell or give away the Atlantic or Pacific Ocean. If it can treat those Oceans as "Territory" within the Constitution's meaning, why could it not deed away thousands of miles of the Atlantic or Pacific at will? I suppose no one would say that the Constitution permits Congress to create new states at least in part out of submerged lands with state power to govern and rule over the "Territory" so disposed of. Would this Court sustain the power of Congress to sell the Mississippi or any of the other great navigable rivers of this country? The Court's decisions here and in the *Niagara Mohawk* case leave me in doubt.

The issues presented are too grave and too doubtful for me to assent to closing the doors of this Court to these States without a more careful consideration of the question than the Court has afforded. For there is a great

---

attempt to relinquish the National Government's power over the Ocean to that extent would ignore the fact that "Navigation on the high seas is necessarily national in its character. Such navigation is clearly a matter of 'external concern,' affecting the nation as a nation in its external affairs. It must, therefore, be subject to the national government." *Lord* v. *Steamship Co.,* 102 U. S. 541, 544.

deal more involved than who gets what oil. Congress has here transferred to the states substantial power over the Ocean. This necessarily makes less readily available the Nation's power to protect the freedom of the seas—a power essential to keep peace and friendship among the nations of the world. I cannot agree to deny these States a full opportunity to challenge the Act.

Mr. Justice Douglas, dissenting.

California lost her claim to the sea beyond the low-water mark by a six-to-two decision. *United States* v. *California*, 332 U. S. 19. Then came a change in the Court's membership; and Texas lost her claim to the marginal sea by a four-to-three decision. *United States* v. *Texas*, 339 U. S. 707. Only three of the majority that decided those cases survive. It would therefore be quite understandable if a majority of the present Court were to take the position of the earlier minority and overrule those decisions. But if those decisions are to stand, it is inconceivable to me that we can deny leave to file the complaints in the present cases. To deny these motions we must hold that the issues tendered are frivolous and insubstantial. But if the earlier decisions are to stand, certainly that cannot be said.

If the issue before us were only the power of Congress to dispose of public lands, the claims of Alabama and Rhode Island would be foreclosed by Art. IV, § 3 of the Constitution. But the entire point of the earlier litigation in the *California* and *Texas* cases was that more than property rights was involved. As we said in *United States* v. *Texas, supra,* p. 719, "once low-water mark is passed the international domain is reached. Property rights must then be so subordinated to political rights as in substance to coalesce and unite in the national sovereign." Any "property interests" which the States may *earlier* have held in the bed of the marginal sea

were "so subordinated to the rights of sovereignty as to follow sovereignty." *Id.*

Thus we are dealing here with incidents of national sovereignty. The marginal sea is not an oil well; it is more than a mass of water; it is a protective belt for the entire Nation over which the United States must exercise exclusive and paramount authority. The authority over it can no more be abdicated than any of the other great powers of the Federal Government. It is to be exercised for the benefit of the whole. As MR. JUSTICE BLACK aptly states in his dissent in these cases, "In ocean waters bordering our country, if nowhere else, day-to-day national power—complete, undivided, flexible, and immediately available—is an essential attribute of federal sovereignty."

Could Congress cede the great Columbia River or the mighty Mississippi to a State or a power company? I should think not. For they are arteries of commerce that attach to the national sovereignty and remain there until and unless the Constitution is changed. What is true of a great river would seem to be even more obviously true of the marginal sea. For it is not only an artery of commerce among the States but the vast buffer standing between us and the world. It therefore would seem that unless we are to change our form of government, that domain must by its very nature attach to the National Government and the authority over it remain nondelegable.

It is said, however, that the interests in the marginal sea may be chopped up, the States being granted the economic ones and the Federal Government keeping the political ones. We rejected, however, that precise claim in the earlier cases. We said, for example, that the "equal footing" clause in the Joint Resolution admitting Texas to the Union precluded the argument that Texas surrendered only political rights over the marginal sea

and retained all property rights in it. 339 U. S., at 716–720.

If it were necessary for Texas to surrender all her property and political rights in the marginal sea in order to enter the Union on an "equal footing" with the other States, pray how can she get back some of those rights and still remain on an "equal footing" with the other States? That is the unresolved question in these cases. That is the question which points up the grievances of Alabama and Rhode Island. For what Texas (and a few other States) obtain by the present Act of Congress is what we held the "equal footing" clause forbade them to retain. The "equal footing" clause, in other words, prevents one State from laying claim to a part of the national domain from which the other States are excluded. 339 U. S., at 719–720. Today we permit that precise "inequality among the States" which we earlier said was precluded by the "equal footing" clause.

Alabama and Rhode Island can justly complain. So can the other States. Our Union is one of equal sovereigns, none entitled to preferment denied the others. That is what the "equal footing" standard means or it means nothing. Today powerful political forces are marshalled to wipe out our prior decisions for the benefit of a favored few. But those decisions were sound in constitutional theory and they should stand. If they presented a question suitable for judicial review, so does the present controversy.