Ramon **FELICIANO**, on his behalf and on behalf of all others similarly situated, Plaintiff,

v.

**UNITED STATES**, The President of the United States, and the Secretary of the Navy, Defendants.

Civ. No. 388–68.

United States District Court
D. Puerto Rico.

March 31, 1969.

Jose A. Suro, San Juan, P. R., for plaintiff.

Charles E. Figueroa, Asst. U. S. Atty., San Juan, P. R., for defendants.

## MEMORANDUM AND ORDER

CANCIO, Chief Judge.

Plaintiff has claimed, on behalf of himself and other residents of the Island of Culebra, Puerto Rico, that the defendants have illegally set up as a defensive sea area the waters out to the three-mile limit. He states that defendants control access to the Island and require all persons to obtain permission from them before entering the restricted area, in violation of the law and his constitutional rights. Defendants deny the control is illegal, allege that setting up of the defensive sea area is legal and entirely reasonable under the circumstances, and deny that their actions in any way constitute a taking of property belonging to plaintiff which would be compensable under the Fifth Amendment to the Constitution.

Plaintiff requested a temporary restraining order, which relief was denied by this Court after hearing the testi-

mony of plaintiff and a number of other witnesses. Defendants have moved for dismissal of this action. After careful consideration of the testimony, all allegations, and the various memoranda filed herein, the Court has concluded that defendants' motion should be granted. This opinion will serve in place of findings of fact and conclusions of law.

*Title 18 of the United States Code, Section 96, gave the President statutory authority to establish defensive sea areas in both war time and peace time, and the President has not abused his discretion in continuing in effect Executive Order No. 8684.*

Executive Order No. 8684 designating the Culebra Island Naval Defensive Sea Area, was promulgated on February 14, 1941, pursuant to the authority given the President by 18 U.S.C. § 96. The pertinent language of that statute reads:

* * * or shall knowingly, willfully, or wantonly violate and duly authorized and promulgated order or regulation of the President governing persons or vessels within the limits of defensive sea areas, which defensive areas are hereby authorized to be established by order of the President from time to time as may be necessary in his discretion for purposes of national defense, * * *

The power of the President of the United States to establish defensive sea areas and issue orders or regulations governing persons or vessels within their limits, given by 18 U.S.C. § 96 as shown above, continues unimpaired in 18 U.S.C. § 2152. Section 2152 provides for the punishment of violators of:

any duly authorized and promulgated order or regulation of the President governing persons or vessels within the limits of defensive sea areas, which the President, for purposes of national defense may from time to time establish by executive order.

Unlike former Section 96, the current provision specifies the use of executive orders in conjunction with exercise of the granted power.

The repeal of Section 96 was accomplished only as part of the revision, codification, and enactment into positive law of Title 18, United States Code. 25 June 1948, Ch. 645, 62 Stat. 683. All former Title 18 sections were repealed and either transferred to other titles or omitted. (Notes preceding 18 U.S.C. § 1; H.Rpt. 304, 80th Cong., 1st Sess. 1947, p. 9) Section 96 was incorporated as new Section 2152. [H.Rept. 304 *supra,* at A326 (incorporation of Act of March 4, 1917, Ch. 180, 39 Stat. 1194) ] Strong congressional desire not to disturb existing law more than necessary was manifested throughout the revision. No inference of legislative construction was to be drawn from the placement of sections or catchlines. (62 Stat. 862) Rights and liabilities existing under repealed sections were not to be affected by the repeal. (Id.) It was noted that the hundreds of sections repealed included all laws incorporated in the revision. (H.Rept. 304 *supra,* at 9.) A ponderous schedule of repeals was prepared to "lift from the courts the onerous task of ferreting out implied repeals." (Id.) It is clear that no omission of the President's power to establish and regulate defensive sea areas was intended or accomplished.

█ It is also clear that Congress would have revoked the executive orders promulgated under Section 96 if it had intended or desired that result. Such action was well within Congress' power.

█ Even if Section 96 had been omitted, and the President's power to establish defensive sea areas abolished, previous executive orders issued under Section 96 would remain valid and in effect until such time as they were specifically revoked.

█ █ This may be seen from the underlying rationale in United States v. Angcog, 190 F.Supp. 696 at 699–700 (D. C.Guam 1961), which in an analogous situation held as follows:

Since executive orders have the force and effect of statutes, United States v. J. D. Streett & Co., D.C.E.D.Mo.

1957, 151 F.Supp. 469, 476 modified 8 Cir., 1958, 256 F.2d 557, rules of statutory construction will be applied to the executive order in question.

The repeal of a law, by an implication arising from a subsequent one, is not favored. Rosenberg v. United States, 1953, 346 U.S. 273, 294, 73 S.Ct. 1152, 97 L.Ed. 1607.

* * * A law is not to be construed as impliedly *repealing a prior law unless no other reasonable construction can be applied.* United States v. Jackson, 1938, 302 U.S. 628, 631, 58 S.Ct. 390, 392, 82 L.Ed. 488.

'Repeals by implication are to be avoided *if any other rational construction of the statute may retain the status quo of the existing law.'* Birnie v. Permanente Metals Corp., 9 Cir. 1951, 192 F.2d 752, 754. [Emphasis added by the District Court of Guam.]

In United States v. Angcog, *supra,* the defendant was charged with unlawfully entering the Guam defensive sea area established by Executive Order No. 8683 (February 14, 1941, 6 F.R. 1015, promulgated simultaneously with Executive Order No. 8684) in violation of 18 U.S.C. § 2152. The Court rejected defendent's argument that Executive Order No. 8683 had been repealed by implication by the Organic Art of Guam (64 Stat. 384, 1950), reasoning that repeal by implication is not favored. Although in *Angcog, supra,* the Court did not specifically consider the effect of Section 2152 upon former Section 96, it did substitute Section 2152 for Section 96 in its reading of Executive Order No. 8683 and in reaching its holding that the executive order remained viable (Executive Order No. 8683 continued in effect until it was specifically revoked by Executive Order No. 11045, August 21, 1962, 27 F.R. 8511.).

■ If the recodification and revision of Title 18, United States Code, had resulted in the repeal of Executive Orders No. 8683 or 8684, then the Court in *Angcog* could not have substituted Section 2152 for Section 96 as mentioned above. Consequently, this Court holds that the revision and recodification of Title 18, United States Code, has not affected the validity of Executive Order No. 8684.

■■ It is to be noted that the statute (18 U.S.C. § 96) did not limit the authority of the President to war time or any other specified contingency. On the contrary, it gave the President discretion to decide when the national defense required a defensive sea area: "It is settled that to all administrative regulations purporting to be made under authority legally delegated there attaches a presumption of the existence of facts justifying the specific exercise." Bailey v. Holland, 126 F.2d 317, 322 (4 Cir. 1942), and cases cited therein. Far from refuting this presumption, the record gives ample evidence of the necessity of the Culebra Island Naval Defensive Sea Area, thus bolstering the presumption that the President has not abused his discretion in continuing in effect Executive Order No. 8684.

Historically, presidents have issued executive orders designating defensive sea areas pursuant to the authority of 18 U.S.C. § 96 and, later, 18 U.S.C. § 2152, in both war time and peace time. Some of those created in war time were repealed at the end of the war and others so created remained in effect during peace time. Some created in peace time remained in effect through alternate periods of peace and war which followed.

■ There has been no presidential revocation of Executive Order No. 8684; it is therefore concluded that Executive Order No. 8684, if constitutional, continues in full force and effect.

*Title 48, Section 749 of the United States Code does not prevent the authority granted by 18 U.S.C. § 96 from applying to Puerto Rico.*

Section 749 of 48 U.S.C. enacted on March 2, 1917, two days prior to that portion of 18 U.S.C. § 96 which gave

the President authority to designate defensive sea areas reads today as follows:

§ 749. Harbors and navigable waters transferred.

The harbor areas and navigable streams and bodies of water and submerged lands underlying the same in and around the Island of Puerto Rico and the adjacent islands and waters, owned by the United States on March 2, 1917, and not reserved by the United States for public purposes, are placed under the control of the government of Puerto Rico, to be administered in the same manner and subject to the same limitations as the property enumerated in Sections 747 and 748 of this Title. *All laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters.* Nothing in this chapter contained shall be construed so as to affect or impair in any manner the terms or conditions of any authorizations, permits or other powers lawfully granted or exercised in or in respect of said waters and submerged lands in and surrounding said island and its adjacent islands by the Secretary of the Army or other authorized officer or agent of the United States prior to March 2, 1917. (Emphasis added. With insignificant changes, this section is substantially the same as when enacted.)

The 1917 version also contained a clause revoking a law empowering the Secretary of War to authorize construction of piers and other facilities on land underlying Puerto Rican waters.

Section 747, to which the above section 749 refers, provides that the property enumerated in it was placed under the control of the Government of Puerto Rico "to be administered for the benefit of the people of Puerto Rico; and the legislature of Puerto Rico shall have authority, subject to the limitations im-

posed on all its acts, to legislate with respect to all such matters as it may deem advisable."

Plaintiff argues that since Section 749 turns over the navigable waters to Puerto Rico, then in order to have a defensive sea area the United States "had to come to Puerto Rico and negotiate with the government as they did in 1902, regarding some lands for the naval base." To support this theory, plaintiff argues that in 1900, Section 13 of the Foraker Act (now 48 U.S.C. § 746) turned over certain land to Puerto Rico. The Navy wanted some land on Culebra Island and was advised by the Attorney General that it would not be warranted in requesting the President to make an assignment of the land to it but that the *usual course* of obtaining a retrocession should be followed as the Government had made no reservation in the land surrender to Puerto Rico. The Government did, in fact, obtain a transfer of the lands from the Legislature of Puerto Rico.

 To suggest that this procedure must be followed to obtain a defensive sea area is incorrect. This is not a case of the unauthorized taking of land by the President. It is a congressionally authorized regulation of navigable waters for the purpose of national defense. Congress clearly retained the power to make laws providing for defense, even if those laws apply to Puerto Rican or other waters; and when it passed 18 U.S.C. § 96, giving the President authority to designate defensive sea areas, that authority included Puerto Rico.

 The retention of congressional power to legislate in regard to Puerto Rican waters is spelled out in the underlined language of 48 U.S.C. § 749, *supra*, "All laws of the United States for the *protection* and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters." As the record discloses, defensive sea areas may

serve the dual purpose of national defense and preservation of navigational interests by enabling the Navy to coordinate its exercises with the regulated coming and going of other ships, thus allowing the Navy to carry out its essential training without endangering other ships. Of course, the defensive areas envisioned by 18 U.S.C. § 96 may also serve to protect navigable waters.

■ However, even if the language of 48 U.S.C. § 749 *is not found broad* enough to encompass 18 U.S.C. § 96, 48 U.S.C. § 734 provides:

> The statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States * * *

This language must be construed as broad enough to encompass 18 U.S.C. § 96, which is by no means "locally inapplicable" within the meaning of 48 U.S.C. § 749 or 48 U.S.C. § 734. In discussing what constitutes a locally inapplicable statute under 48 U.S.C. § 749, the Court in Guerrido v. Alcoa Steamship Co., 234 F.2d 349, 355 (1 Cir. 1956), stated:

> We conclude, therefore, that the rules of admiralty and maritime law of the United States are presently in force in the navigable waters of the United States in and around the island of Puerto Rico to the extent that they are not locally inapplicable either because they were not designed to apply to Puerto Rican waters or because they have been rendered inconsistent by Puerto Rican legislation. *This is not to say, of course, that Puerto Rican legislation could thus supplant a rule of maritime law which Congress in the exercise of its constitutional power has expressly made applicable to Puerto Rican waters.* (Emphasis added.)

Following the holding in Guerrido, Fonseca v. Prann, 282 F.2d 153, 156 (1 Cir. 1960) cert. den. 365 U.S. 860, 81 S. Ct. 826, 5 L.Ed.2d 822 (1961), held that the Jones Act (meaning the act regarding mariner's workmen's compensation, and not to be confused with the Organic Act of 1917, also called the Jones Act) was not inherently inapplicable to Puerto Rico, but, on the other hand, since there was nothing in the Jones Act making it specifically applicable to the territorial waters of Puerto Rico, Puerto Rico was free to enact workmen's compensation legislation inconsistent with the Jones Act. The Court was careful to point out that Congress could supplant such local legislation by making the Jones Act specifically applicable to Puerto Rican waters.

■ ■ Thus, as regards general maritime law, these cases give Puerto Rico the limited power of making "locally inapplicable" a federal maritime statute not specifically applicable to Puerto Rico. Section 96 of 18 U.S.C. does not specifically mention Puerto Rico and, certainly, does not except it from the operation of defensive sea areas. However, Plaintiff has not pointed out any Puerto Rican statute which purports to make 18 U.S.C. § 96 "locally inapplicable." Furthermore, even if he could find such a statute, it could not make 18 U.S.C. § 96 "locally inapplicable" for the reason that 18 U.S.C. § 96 is geared to national defense, as distinguished from workmen's compensation. Congress might reasonably think that the local interests in providing for injured workmen and framing maritime rules might justify allowing Puerto Rico to enact maritime compensation statutes differing from the non-specific federal statutes, but, by its very nature, national defense cannot be regulated in at least by local government of Puerto Rico or any state.

Whereas in *Guerrido, supra,* the court was able to find some legislative intent by Congress that Puerto Rico be allowed to mold its own workmen's compensation laws for mariners, pointing out 234 F.2d at page 355 that, at about the same time Congress enacted 48 U.S.C. § 749 as a part of the Organic Act of 1917, it also sought to grant similar authority to the states to provide workmen's compen-

sation for mariners,* there is no evidence that Congress intended for Puerto Rico to be able to legislate contrary to the most general statutes dealing with national defense as regards its waters.

The facts point to an opposite conclusion. For example, nowhere is Puerto Rico given any power to provide for defense other than the powers enjoyed by the states to have a national guard and similar local defense forces, with the Governor as commander-in-chief. "The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories." "The effect was to confer upon the territory many of the attributes of quasi-sovereignty possessed by the states—as for example immunity from suit without their consent." Puerto Rico v. Shell Co. (P. R.) Limited, et al. (1937), 302 U.S. 253, 261–262, 58 S.Ct. 167, 82 L.Ed. 235.

▬▬ So long as Puerto Rico retains a "Commonwealth" status, it may be free in the management of its own local affairs but it does not have independent and separate existence," and "it is linked to the United States of America and hence is a part of its political system in a manner compatible with its Federal structure." Resolution 22, approved by the Constitutional Convention of Puerto Rico, February 4, 1952. Congress has the obligation under the Federal Constitution of providing for the common defense, Gara v. United States, 178 F.2d 38 (6 Cir. 1949), aff. 340 U.S. 857, 71 S.Ct. 87, 95 L.Ed. 628 (1950), and Puerto Rico being a part of the political system of the United States, and its people being United States citizens, this obligation to provide for the common defense extends to her. Since Congress has

not agreed with Puerto Rico, by means of a compact or otherwise, to provide for its own defense, independent of United States national defense efforts, but has, for lack of an agreement, maintained Puerto Rico on a par with the states regarding defense, it cannot reasonably be maintained that Congress would intend that Puerto Rico be given the power to tailor to local tastes and Act of Congress which relates to national defense simply because the act applies generally to all the waters of the United States, without specifically designating Puerto Rico.

In fact, as long as Puerto Rico remains a part of the United States, it would probably be unconstitutional for Congress to allow Puerto Rico any say whatever over maritime regulations involving national defense. As was pointed out in footnote 1, Knickerbocker Ice Co. v. Stewart, *supra,* places the holding in *Guerrido,* enabling Puerto Rico to pass maritime workmen's compensation laws, inconsistent with those of the United States which do not specifically apply to Puerto Rico, at the constitutional border line. If this power is borderline, the power to alter this law relating to national defense does not exist. In Alabama v. Texas, et al. (1954), 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689, the constitutionality of the Submerged Lands Act of 1953, 67 Stat. 29, was challenged. That Act conveyed to some of the states title to land under the ocean but retained United States control of "said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs * * *." The Supreme Court dismissed the complaint in a *per curiam* decision, stating that the power of Congress to dispose of any kind of property belonging to the United States

---

\* Knickerbocker Ice Co. v. Stewart (1920), 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, held the latter to be an unconstitutional delegation of congressional power to the states, but the Court of Appeals, First Circuit, deciding *Guerrido, supra,* 234 F.2d page 356, stated that "what Congress could not constitutionally delegate to the legislature of a state as the

organ of an independent sovereignty, it might well be able to delegate to the legislature which it had created for a territory which it had organized." As authorities the Court cited four cases in footnote 22, page 356. In view of this it would appear that even the limited authority conferred on Puerto Rico by *Guerrido* is on the border of constitutionality.

is vested in Congress without limitation. Mr. Justice Reed, concurring, pointed to the above quoted retention of Federal power and explained at page 276, 74 S.Ct. at page 483 that "the cession challenged here does not affect the *power and responsibility of the United States as sovereign to foster and protect against foreign and domestic enemies* that area of resources ceded to the proprietorship of the respective states." (Emphasis added.) However, in spite of the broad retention of Federal powers, Justices Black and Douglas dissented. At page 278, 74 S.Ct. at page 484, Mr. Justice Black stated,

> In ocean waters bordering our country, if nowhere else, day-to-day national power—complete, undivided, flexible, and immediately available is an essential attribute of federal sovereignty.

At page 282, 74 S.Ct. at page 486, Mr. Justice Douglas stated:

> Thus we are dealing here with incidents of national sovereignty. The marginal sea is not an oil well; it is more than a mass of water; it is a protective belt for the entire Nation over which the United States must exercise exclusive and paramount authority. The authority over it can no more be abdicated than any of the other great powers of the Federal Government.

Of the bench that decided Alabama v. Texas, only Justices Black and Douglas, who dissented, and Chief Justice Warren, who took no part in the consideration or decision of the case, now remain on the Supreme Court.

This Court therefore concludes that 48 U.S.C. § 749 in no way prevents the authority granted to the President by 18 U.S.C. § 96 (replaced by 18 U.S.C. § 2152), and any actions taken or orders promulgated in accordance with such authority, from applying to Puerto Rico.

*The power to create defensive sea areas both in war time and peace time is constitutional, and the enforcement of Executive Order 8684 does not consti-* *tute either a taking of Plaintiff's property without compensation, in violation of the Fifth Amendment, or an unconstitutional restriction of personal liberty.*

Congress has the obligation under the Federal Constitution of providing for the common defense. Gara v. United States, supra. Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Berman v. Parker (1954), 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27. The basic power to legislate for national defense purposes being present, and given the power of choice of means, the pertinent questions become: (1) Did Congress overstep a constitutional limit in choosing, as a means, to authorize the President to designate defensive sea areas, and (2) Did the President overstep a constitutional limit in the manner he created the defensive sea area in question.

A case indicating a "no" answer to both of these questions is Perko v. United States, 204 F.2d 446, (8 Cir. 1953) cert. den. 346 U.S. 832, 74 S.Ct. 48, 98 L.Ed. 355 (1953). The facts in that case are that 49 U.S.C. § 174 (repealed by 72 Stat. 806) authorized the President to set up airspace reservations in the United States for national defense or other governmental purpose. Executive Order No. 10092 set up such an area to protect the wilderness character and aid in the administration of Superior National Forest. The defendants there owned resorts in the roadless area covered by the airban so that they were prevented from entering by airplane, thus greatly curtailing the value of their properties for resort purposes. The Court held that the statute was not unconstitutional as an unlawful delegation of power vested only in Congress, though, as construed, it gave the President authority to set apart an airspace reservation for any and every governmental purpose. Nor was it unconstitutional as a deprivation of property without due process of law or a taking of property for public use without just com-

pensation. The rationale on the taking issue was simply that the defendants did not own the sky above their property, the United States having exclusive national sovereignty in the airspace above the United States. Likewise, in the case at bar, Plaintiff does not own the navigable waters around Culebra.

A case concerned with access to navigable waters is United States v. Commodore Park (1945), 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017. There the Navy dredged a bay to make it suitable for the operation of seaplanes. This was done pursuant to the authority given the Navy by Congress to establish, develop and increase the naval aviation facilities of the base—48 Stat. 957; 53 Stat. 590-592; 53 Stat. 757, 772-773. The dredged material was deposited in Mason Creek, between the shores of Government owned land, thus cutting off the remainder of Mason Creek, along which respondent's land bordered, from any navigable outlet to the bay and sea. The Supreme Court, agreeing in this regard with the Court of Appeals, held that the project was related to commerce and navigation. The Court stated at page 391, 65 S.Ct. at page 805:

Whatever market value of riparian lands may be attributable to their closeness to navigable waters, does not detract from the government's "absolute" power, in the interests of commerce, to make necessary changes in a stream. In short as against the demands of commerce, an owner of land adjacent to navigable waters, whose fast lands are left uninvaded, has no private riparian rights of access to the waters to do such things as "fishing and boating and the like", for which the government must pay.

The language above refers to the power to regulate navigable waters in the interest of commerce, rather than the defense power. However, as was said earlier, Executive Order No. 8684 serves the commerce-navigation purpose of coordinating the Navy's legitimate training program with the navigational ingress to and egress from Culebra. "The 'fact that purposes other than navigation will also be served could not invalidate the exercise of the authority conferred, even if those other purposes would not alone have justified an exercise of Congressional power.'" United States v. Commodore Park, supra, at 391–392, 65 S.Ct. at 806, quoting Arizona v. California (1931), 283 U.S. 423, 456, 51 S.Ct. 522, 75 L.Ed. 1154. Thus in Commodore Park, supra, the Navy acted pursuant to authority to create a base and as the Court of Appeals pointed out in its consideration of the case, 143 F.2d 720, 724 (4 Cir. 1944), rev. on other grounds.

Although the deepening of the bay was incident to the enlargement of the Naval Base for national defense and the primary purpose to be served by the dredging was the accommodation of naval seaplanes and vessels, the project, nevertheless related to commerce and navigation and was carried out in the exercise of the governmental power in this field.

In the case at bar the President is authorized to create defensive sea areas for purposes of national defense. Executive Order No. 8684 is primarily designed for this purpose. In addition, it also affects commerce and navigation and is an exercise of governmental power in the field.

However, even if Executive Order No. 8684 did not serve navigational purposes, what Commodore Park, supra, held relating to the dominance of the commerce power over riparian rights also applies to the defense power, especially in view of Perko, supra, which held constitutional the power of the President to make airspace reservations for any governmental purpose without having to compensate the owners of isolated lands to which easy access is thus cut off.

In Ex Parte Lincoln Seiichi Kanai, 46 F.Supp. 286 (D.C.E.D.Wis.1942), July 29, 1942, the Honorable Judge Duffy stated that:

Rights of the individual, under our federal Constitution and its amendments, are not absolute. When such

*rights come into conflict with other rights granted for the protection and safety and general welfare of the public, they must at times give way. There is no individual right so absolute that it may be exercised under any and all circumstances, and without any qualification.*

In Re Schroeder Hotel Co., 7 Cir., 86 F.2d 491, Hitchman Coal & Coke Co. v. Mitchell et al., 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461. At the present time, the rights of our citizens to come and go as they please may be somewhat restricted by the necessity of protecting this nation from our enemies in time or war. The Constitution makes the President of the United States the commander in chief of our armed forces. Const. art. 2, § 2, cl. 1. The power to conduct war is placed by our Constitution in the President and in the Congress. (Emphasis added.)

 Moreover, there is here no wrongful infringement on Plaintiff's personal liberties. There is only a noncompensable burden on access to Culebra property similar to that placed on the parties in *Perko* and *Commodore, supra,* in the former by regulation and in the latter by physical blockage.

In this case, plaintiff and others similarly situated apparently have been regularly going out of and into the Municipality of Culebra, without obtaining permission from defendants. Although Executive Order No. 8684 is in full force and effect; it has not been applied to the plaintiff and any other person similarly situated; and no prosecutions under Section 2152, U.S.C. Title 18, have been instituted. As a matter of fact, there is presently established a ferry boat service duly authorized by the defendants to transport daily cargo, freight and passengers to and from the Island of Culebra through a prearranged schedule and route without any interference from the naval authorities. Airplanes fly regularly to Culebra. Private boats and planes only have to ask permission in order to enter or leave, which permission has al-most never been denied in the past, and never arbitrarily. Permission could be easily obtained daily from defendants for access to the island, and for the safety of plaintiffs it would certainly seem that this is a far from unreasonable requirement in light of the use of the area as a firing and testing range.

From the point of view of the Navy, they have stated that continuation of this Naval Defensive Sea Area and Naval Airspace Reservation is necessary to the accomplishment of the military mission of the United States, and that continued control over Culebra is necessary for the national defense. The Navy has continued to invest large amounts of money and effort in the Atlantic Fleet Weapon Range which includes the Vieques and Culebra complex and feels it is imperative to continue to develop this complex to the maximum practicable degree, so that, in time, virtually all of their advanced weapons training can be accomplished in this area.

The Navy has no other comparable training area in the Atlantic. The present Navy/Marine targets and training areas on, and adjacent to, Culebra and Vieques Islands have served well to train many Atlantic Fleet aircraft, ships, and landing force teams, but the present requirements make it urgent to preserve the ability of the Atlantic Fleet Weapons Range and associated target areas to support realistic fleet training. To do this, the Navy needs a target area free of restrictions, where training can be conducted that will exercise weapons and systems through their operational limits, and needs Culebra because:

1. It is essential to complete the Atlantic Fleet weapons range capability.

2. There is no other suitable place in the Atlantic area for a target complex for missiles and advanced weapons.

3. Without such a target complex, the operational readiness of Atlantic Fleet units will be seriously impaired.

4. Without continued naval control over civilian access and egress to the naval defensive sea area and naval air-

space reservation, the vital fleet training could not be conducted.

In short, the Government has selected the "least drastic means" of achieving the congressional objective of safeguarding the national security of the United States.—Compare Aptheker v. Secretary of State (1964), 378 U.S. 500, 512, 84 S.Ct. 1659, 12 L.Ed.2d 992. The Government has clearly not acted capriciously or arbitrarily in establishing the Culebra Island Defensive Sea Area. Cf. United States v. Carmack (1946), 329 U.S. 230, 243, 67 S.Ct. 252, 91 L.Ed. 209. On the contrary, in issuing Executive Order No. 8684, the President has apparently selected the least drastic means of reconciling defense and private needs. In any event, this Court cannot and will not, under these circumstances, substitute its judgement for that of the Executive branch in a matter of this nature.

For the foregoing reasons, it is ordered that defendants' motion be, and it is hereby, granted. The complaint in this action is hereby dismissed, with prejudice.