**UNITED STATES of America, Plaintiff,**

**v.**

**Manuel RIVERA TORRES, Defendant.**

**Civ. No. 86–1917.**

United States District Court,
D. Puerto Rico.

Feb. 20, 1987.

Daniel Lopez Romo, U.S. Atty., Eduardo E. Toro Font, Asst. U.S. Atty., Hato Rey, P.R., for plaintiff.

Edelmiro Salas Garcia, Santurce, P.R., for defendant.

## OPINION AND ORDER

GIERBOLINI, District Judge.

This is an action brought by the United States seeking injunctive and punitive relief to prevent defendant, Manuel Rivera Torres (Rivera) from filling certain wetlands within a large plot of land located in Punta Picúa, Río Grande, Puerto Rico. This case is presently before us on the United States' motion for a preliminary injunction and defendant's opposition thereto. Jurisdiction is invoked under 28 U.S.C. § 1345 and under the Federal Water Pollution Control Act (commonly known as the Clean Water Act), 33 U.S.C. § 1251 *et seq.*

The sector of Punta Picúa is located on the northern coast of Puerto Rico, in the municipality of Río Grande. Within that sector lies a large farm measuring 782.73 "cuerdas" (cds.)[1], whose original owner was U.S. Industries, Inc. Most of this farm is covered by a large mangrove forest, but its northern portion is beachfront property. On July 5, 1983, U.S. Industries, Inc. divided the farm into thirty narrow tracks of at least 25 cds. each, which it sold to private parties. Each of these tracks has access to the beach. Rivera presently owns lots numbered 11, 17 and 18 of the larger farm.[2]

On February 20, 1985, the United States Army's Corps of Engineers (the Corps) performed an aerial surveillance over Punta Picúa and discovered that heavy machinery was being operated near the area covered by the mangrove forest within lots 17 and 18. Because the Corps understood that this forest was a wetland under its jurisdiction, it notified Rivera that he needed a permit before filling any wetlands in his property. On July 26, 1985, the Corps issued a cease and desist order to Rivera. On September 17, 1985, both parties agreed on a restoration plan for the wetland areas that Rivera had filled. Rivera apparently reneged because according to the Corps on February 6, 1986, he was again spotted depositing fill material on lots numbered 5 and 6 of the larger farm. On November 5, 1986, the Corps issued a second cease and desist order to Rivera, ordering him to stop filling the wetlands located within lots 10 and 11. Consistent with his pattern of conduct, on December 11, 1986, Rivera worked with heavy machinery in the wetlands area within lots 17 and 18. Officers

---

1. One "cuerda" equals .97 acres.

2. This parcel of land is described as follows in the Spanish language:

... RUSTICA: Parcela de terreno localizada en el Barrio Mameyes del término municipal de Río Grande, con un área de SETECIENTOS OCHENTA Y DOS CUERDAS CON SETENTA Y TRES CENTESIMAS DE CUERDA (782.73), equivalentes a TRES MILLONES SETENTA Y SEIS MIL CUATRO–CIENTOS TREINTA Y OCHO PUNTO CINCO MIL SETECIENTOS CUARENTA Y TRES METROS CUADRADOS (3,076,438.5743 Mts. C.), colindando, por el NORTE, con el Mar y con la parcela "S" propiedad de U.S. Industries, Inc.; por el ESTE, con terrenos de la Hacienda Carmelita de Sucesores de Bird León, hoy Carlos García Busó; por el SUR, con Francisco Román, hoy Carlos García Busó y con la Hacienda Carmelita de Jorge Bird León, hoy su Sucesión y con la parcela "S" propiedad de U.S. Industries, Inc.; por el OESTE, con la Laguna Maquinillas y en una pequeña parte hoy con el embarcadero de los Rodríguez y con la Sucesión de Don Rosendo Matienzo Cintrón.

This property appears registered at Page Ninety Six (96) overleaf, of Volume One Hundred Sixty Six (166) of Río Grande, Registry of the Property of San Juan, Seventh Section, and appears as Property Number Eight Thousand Two Hundred Sixty Three (8,263).

of the Corps approached Rivera and requested that he stop filling the wetlands and cutting down trees. Rivera refused.

The United States brought the instant action against Rivera, requesting a temporary restraining order to enjoin him from further filling the wetlands in his property. Said order was issued on December 24, 1986. We held an evidentiary hearing on January 5, 1987 and thereafter conducted a site inspection of the Punta Picúa area. Both parties have filed legal memoranda before us and the matter now stands submitted.

Before addressing the United States' request, we shall first resolve some jurisdictional questions raised by Rivera in his memorandum of law. Rivera argues that we lack jurisdiction to entertain this action on three grounds: 1) that the Clean Water Act does not apply to Puerto Rico; 2) that the mangrove forest in Punta Picúa is not a wetland, and 3) that this matter is already *subjudice* at the Puerto Rico courts. We consider that the first two arguments actually question the standing of the United States to bring this action and the jurisdiction of the Corps over Punta Picúa while the third one questions our subject matter jurisdiction. We shall address each contention in turn.

The Clean Water Act (the Act) makes it unlawful for any person to discharge any pollutant into the waters of the United States, unless that person falls under any of the exceptions contained therein. 33 U.S.C. § 1311(a). Pursuant to 33 U.S.C. § 1344(a), the Secretary of the Army (the Secretary) may issue permits for the discharge of fill materials into the waters of the United States. In doing so, the Secretary acts through the Chief of Engineers, who enacts the regulations that apply to this section. 33 U.S.C. § 1344(d). If a person fails to obtain such a permit before discharging any fill materials, the United States may take a civil action before the federal district court where the violation took place to request appropriate relief. 33 U.S.C. § 1319(b). The person is further exposed to both civil and criminal penalties. 33 U.S.C. § 1319(c) and (d).

Rivera asserts that the Corps of Engineers lacks jurisdiction over Punta Picúa because Congress has transferred to the government of Puerto Rico its control over the island's navigable waters by enacting Section 8 of the Puerto Rican Federal Relations Act, 48 U.S.C. § 749. This statute, in relevant part, reads as follows:

> The harbor areas and navigable streams and bodies of water and submerged lands underlying the same in and around the island of Puerto Rico and the adjacent islands and waters, ..., are placed under the control of the government of Puerto Rico ... All laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and commerce, except so far as the same may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters ...

■ This statute grants the Commonwealth of Puerto Rico a limited power to make "locally inapplicable" a federal maritime statute which Congress has not specifically applied to Puerto Rico by enacting inconsistent legislation. That is the lesson taught by cases like *Guerrido v. Alcoa Steamship Co.*, 234 F.2d 349, 355 (1st Cir. 1956); *Feliciano v. United States*, 297 F.Supp. 1356, 1361 (D.P.R.1969), *aff'd*, 422 F.2d 943 (1st Cir.1970), *cert. denied*, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970). However, this does not authorize the Commonwealth to supplant a maritime rule that Congress, in the exercise of its constitutional power over the United States' territories, has expressly made applicable to Puerto Rico. *United States v. Ferrer*, 613 F.2d 1188, 1193 (1st Cir.1980); *García v. Friesecke*, 597 F.2d 284, 287 (1st Cir.), *cert. denied*, 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979); *Guerrido, supra.* Congress expressly made the Clean Water Act applicable to Puerto Rico by including it under the Act's definition of "State". 33 U.S.C. § 1362(3). It has been further held that Section 1344, the specific section in controversy, applies to Puerto Rico. *Com-*

*monwealth of Puerto Rico v. Alexander,* 438 F.Supp. 90, 96 (D.D.C.1977).

To buttress his claims, Rivera relies primarily on the recent decision by the Court of Appeals for the First Circuit in the case of *Pérez de la Cruz v. Crowley Towing and Transportation Co.,* 807 F.2d 1084 (1st Cir.1986). We find, however, that reliance on that case is mislaid. In *Pérez de la Cruz,* the statute in question was the Jones Act, 46 U.S.C. § 688, which provides for a remedy to seamen suffering accidents in the waters of the United States. Puerto Rico had enacted its own legislation granting such remedy to resident seamen within the Puerto Rico Workmen's Accident Compensation Act, 11 L.P.R.A. §§ 1–42. After citing a long line of First Circuit decisions regarding the applicability of the Jones Act to Puerto Rico, the court held that Puerto Rico had displaced federal maritime law with respect to accidents to its resident seamen by enacting inconsistent local legislation. *Pérez de la Cruz,* at 1089. We must note, however, that unlike the case of the Clean Water Act, Congress never made the Jones Act expressly applicable to Puerto Rico. Furthermore, Rivera has failed to cite or even mention a single piece of legislation by the Commonwealth of Puerto Rico that could be inconsistent with the Clean Water Act. But even if he had, we still could not hold that it could overrule the express intent of Congress to apply the Act to Puerto Rico. *Guerrido, supra.* It is beyond cavil, and so we hold, that the Clean Water Act, and specifically Section 1344, applies to Puerto Rico.

We must also note that Section 1344 itself provides for the implementation by States of their own permit program, which would substitute the Federal permit program once the former is approved by the Secretary. 33 U.S.C. § 1344(h). Puerto Rico, like any State, may establish such a program under this section. Since Rivera has not shown that such a program exists in Puerto Rico, and our research reveals that the Secretary has approved none, we are compelled to conclude that the Corps and the United States may enforce the provisions of the Act in Puerto Rico's waters.

Rivera's second argument is that the Corps lacks jurisdiction over the mangrove forest in Punta Picúa because that area is neither a "navigable water of the United States" nor a "wetland" for the purpose of the Act. This tenuous contention finds no support in the regulatory scheme, the law or the interpretative jurisprudence.

The term "navigable waters of the United States" is defined in the act to mean "the waters of the United States, including the territorial seas". 33 U.S.C. § 1362(7). The regulations enacted by the Corps under the Act place wetlands under the definition of the term "waters of the United States", 33 C.F.R. § 323.2(a)(3). The term "wetlands" is further defined as

those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

33 C.F.R. § 323.2(e). Wetlands separated from other waters of the United States by man-made barriers, beach dunes and the like are "adjacent wetlands" under Section 323.2(a)(7). 33 C.F.R. § 323.2(d).

The definitions of "wetlands" and "adjacent wetlands" in the Secretary's regulations were recently upheld by the United States Supreme Court in *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In *Riverside,* the Court stated that the definition of "wetlands" does not depend on whether they are "navigable waters" or not, or on their altitude above sea level, but that it depends on the humidity of the soil and the prevalence of vegetation typically adapted for life in saturated soil conditions. *Riverside,* 106 S.Ct. at 460–461.

At the hearing held on January 5, 1987, Juan Molina-Méndez (Molina), a biologist with the Corps of Engineers, testified as an expert that the Corps usually works on a case-by-case basis in determining whether a certain area is a wetland. He further stated that he performed on 1986 a study on the hydrology of the terrain in Punta

Picúa, and the characteristics of its vegetation. He determined that the soil in the area had a low content of oxygen, as is typical in wetlands. The vegetation in the area consisted mostly of white and black mangrove trees and *casuarina* trees, and grasses typical of wetlands as well as palm trees, which are capable of growing in wetlands. As a result of this study, the Corps concluded that the mangrove forest in Punta Picúa is a wetland under its jurisdiction.

On January 7, 1987, we performed a visual inspection of the Punta Picúa sector. This inspection concentrated on lots 11, 16, 17 and 18 of the larger farm. We began our inspection next to a line of utility poles placed besides a narrow dirt road that runs through the entire farm. At this place, the land was wet, there were many puddles of water and small grass vegetation. Notwithstanding the fact that it had rained the previous two days, we noticed that the water at that place was stagnant. At a distance of 50 to 75 feet south of the line of poles was a line of *casuarina* trees, where the mangrove forest began. We noticed that there were some large cleared areas with very little or no vegetation in which tracks of heavy, earth moving machinery were clearly noticeable. Throughout the area inspected we noted that many trees had been uprooted or pulled out, apparently by machinery.

■ After crossing the line of *casuarina* trees, we entered the mangrove forest. The soil was firm, though wet, with large puddles of stagnant water all over the area. The grass and the trees became progressively taller and the water level progressively higher as we walked southward into the forest. The vegetation consisted largely of white mangrove, black mangrove and *casuarina* trees up to fifty feet high. The conditions we found on lots 16, 17 and 18 were also present in lot 11 as well. The wetlands are separated from the sea by beach dunes in the northern portion of the farm. Our observations confirmed the testimony given by Medina at the January 5 hearing. Consequently, we agree with the Corps and find that the mangrove forest of Punta Picúa meets all the conditions of a wetland and is in fact a wetland. We also hold that the Corps has jurisdiction and authority to require Rivera to obtain a permit before he could fill the wetlands in his property. We further find that Rivera has probably been filling large portions of the wetlands without such a permit in violation of the Clean Water Act.

Rivera's last jurisdictional argument is that we lack jurisdiction over this matter because a related action is pending before the Puerto Rico courts. In 1984, a group of fishermen filed an action before the Puerto Rico Superior Court, Carolina Part, against the landowners of Punta Picúa. Plaintiffs were joined by several Puerto Rico agencies, notably the Natural Resources Department of the Commonwealth (NRD). On February 28, 1986, the local court issued a preliminary injunction in which defendants were enjoined from, among other things, filling the mangrove forest and cutting down any trees in Punta Picúa. Rivera argues that the matter before us is therefore already *subjudice* at the Puerto Rico courts and that we lack jurisdiction to act on the Corps' action.

■ We find no merit in Rivera's claim. As we have stated before, the Clean Water Act is quite clear in granting the Secretary of the Army original jurisdiction and authority to issue permits for the filling of any waters of the United States. 33 U.S.C. § 1344(a), (d). Moreover, Congress has expressly granted federal district courts the original jurisdiction to entertain actions brought by the United States against any person who violates the provisions of the Act. 33 U.S.C. § 1319(a)(3) and (b) and § 1344(s). It will be a dereliction of our duties to decline jurisdiction. We are aware, of course, that Section 1344(t) allows any State, including Puerto Rico, to control the discharge of fill material in any portion of the waters within its jurisdiction. However, unless that State has implemented its own permit program, in accordance with Section 1344(h), its jurisdiction on the matter of permits is not exclusive, but concurrent with that of the Secretary. Otherwise, the intent of Congress in delegating to the Secretary the responsibility for

granting Section 1344 permits would be defeated.[3] Since the Commonwealth of Puerto Rico has not implemented such a permit program, we find that its jurisdiction to protect the wetlands at Punta Picúa is concurrent with that of the United States. Plaintiff may therefore exercise the power that the Act expressly grants it by bringing the present action. There is no conflict whatsoever between the local agencies and the Corps in their efforts to protect and preserve the valuable natural resources of Puerto Rico. In light of all of the above, we find that we have subject matter jurisdiction to entertain the action before us.

Now we shall address the merits of the United States' request for a preliminary injunction under Federal Rule of Civil Procedure 65(a). It is well settled that the decision whether to grant or deny a preliminary injunction lies within the discretion of the trial court. *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189 (1940); *Anheuser-Busch, Inc. v. Teamsters Local No. 633*, 511 F.2d 1097, 1099 (1st Cir.), *cert. denied*, 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). In making such a decision, we must consider the following factors: 1) Whether plaintiff will suffer irreparable injury if the preliminary injunction is not granted; 2) whether such injury outweighs any harm that granting injunctive relief would cause on the defendant, 3) whether plaintiff has established a likelihood of success on the merits and 4) whether the public interest will not be adversely affected by the granting of the injunction. *Mass. Coalition of Citizens v. Civil Defense Agency*, 649 F.2d 71, 74 (1st Cir.1981); *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

Before reaching the merits of the United States' petition, we must first establish the importance for the environment of the wetlands at Punta Picúa. At the hearing, Medina testified that wetlands produce a large amount of leaves which in turn become a biomass that eventually develops as the primary source of the food chain. Medina further stated that wetlands prevent the displacement of sediment that may destroy corals, and that this in turn prevents the erosion of beaches by tidal waters. The regulations enacted by the Corps recognize the need to protect wetlands that perform functions important to the public interest. 33 C.F.R. § 320.4(b)(1). Among these wetlands are those that serve biological functions such as food chain production, those that preserve natural sedimentation patterns and those that shield other areas from wave action and storm damage. 33 C.F.R. § 320.4(b)(2)(i), (iii) and (iv). Since the wetlands at Punta Picúa clearly fall within these classifications, we conclude that they are a valuable resource which the United States has a duty to protect.

■ We are mindful that only a viable threat of serious harm which cannot be undone justifies the granting by a court of an injunction before the merits are fully determined. *Mass. Coalition of Citizens, supra; Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir.1975). Such a threat is present here. The evidence submitted by the United States before us, as well as our observations during the visual inspection of the area, lead us to believe that Rivera will, in all likelihood, continue filling the wetlands unless an injunction is granted. We also consider that the damage that the continued filling of the wetlands will cause is serious. At the hearing, the expert testified that filling the wetlands, if unrestrained, will not only affect the filled area, but the surrounding areas as well. He was of the opinion that the areas that have been filled so far reflect a downgrading of the vegetation, from large trees to small trees and grass. This was confirmed by our site inspection. This damage cannot be repaired even by restoration, as it would take eight or nine years for the wetland to develop again after the fill material has been removed. Any harm caused in the interim by the absence of a wetland may not be undone. We therefore find that in this

---

**3.** *Cf. International Paper Co. v. Ouellette, et al,* —— U.S. ——, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).

case there is an actual threat of serious harm that justifies the issuance of an injunction.

We further consider that the damage to the United States and to the public that would be caused by the unrestrained filling of wetlands in Punta Picúa clearly outweighs any harm that granting the preliminary injunction would inflict on Rivera. The only damage Rivera has claimed that he would suffer as a result of the injunction is the temporary detention of his plans to develop his property. But at this stage of the proceedings any harm to Rivera is far from certain, and in any event is greatly outweighed by the harm the public would suffer if injunctive relief is not granted.

From all the evidence we have received so far from the parties, and from our observations at Punta Picúa, we further find that the United States has shown a substantial likelihood of success on the merits that would justify the granting of an injunction at this time. *Tremblay v. Marsh*, 750 F.2d 3, 7 (1st Cir.1984). We also find that the public interest, as enacted by Congress in 33 U.S.C. § 1251 and by the Corps in its regulations, will not be adversely affected by the granting of the preliminary injunction, but will in fact be benefited.

In light of all of the above, we find that the granting of a preliminary injunction enjoining Rivera from filling the wetlands at Punta Picúa is fully justified. Therefore, the United States' petition for a preliminary injunction shall be and is hereby GRANTED.

### ORDER

Defendant Manuel Rivera Torres, his agents and employees, are hereby ordered to cease, desist, stay, and paralyze any filling, cutting or destruction of, or uprooting of mangroves, or filling of wetlands for any purpose or perform any other act which would destroy, modify, change or alter the terrain, condition, flora, waters, beaches, depths and contours of the lands and waters found in lots 11, 17 and 18 within the parcel of land described in Footnote 2 of this Opinion and Order.

This Order shall be served by the U.S. Marshal on Manuel Rivera Torres and his attorney and shall be effective until this case is finally concluded. A status conference is hereby scheduled for March 6, 1987 at 9:00 a.m. At that time we shall set a date for trial on the merits and consideration of the United States' request for a permanent injunction and for civil penalties against defendant.

SO ORDERED.